## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH DIVISION

Case No.: 9:10-cv-80771-KLR

| | |
|---|---|
| Roy Magnifico, Roma Lim, Rezza Real, Jeanette Halup, Bonifacio Ramos, Lucille Liwag, Ross Ripotola, Raul Rueda, Aries Caluya, Aris Ordonez, Ritche Relampagos, Percival De Quiros, and Jose Auingan, Denlit Fausto, Cesar Ramos, Irene David, Arnold Laxamana, Robert Bautista, <br><br>     Plaintiffs <br><br><br> v. <br><br><br><br> Roberto Villanueva, Redelina Fernandez, Star One Staffing, Inc., Star One Staffing International, Mary Jane Hague, John Carruthers, and Ruth Carruthers, <br><br>     Defendants. | PLAINTIFFS' SECOND AMENDED COMPLAINT <br><br> JURY TRIAL DEMANDED |

## CIVIL COMPLAINT

### PRELIMINARY STATEMENT

1.      Plaintiffs, citizens of the Philippines, bring this action regarding forced labor and human trafficking to recover for damages inflicted by Defendants Star One Staffing, Inc., Star One Staffing International, Roberto Villanueva, Redelina Fernandez, Mary Jane Hague, John

Carruthers and Ruth Carruthers.  Defendants recruited Plaintiffs from the Philippines and United States, using fraudulent visa applications, false promises and misrepresentations regarding the terms and conditions of employment to induce Plaintiffs to work for Defendants in the United States.

2.      Defendants forced Plaintiffs to live in severely overcrowded housing and to work long hours in country clubs and hotels in Florida and New York. To ensure that Plaintiffs complied with their demanding work schedules, Defendants threatened Plaintiffs with arrest, imprisonment, deportation, cancellation of their visas, loss of work, lawsuits, and blacklisting and convinced Plaintiffs that they had close relationships with officials in the U.S. and Philippine governments.  Defendants also deducted exorbitant monthly fees from Plaintiffs paychecks for food, housing, and transportation, despite having promised Plaintiffs during recruitment that these would be provided for free.  As a result of this campaign of fraud and coercion, Plaintiffs remained in constant fear of the Defendants and believed they had no choice but to obey their orders and continue working.

3.      Plaintiffs assert claims arising from violations of their rights under the Trafficking Victims Protection Act (18 U.S.C. §1589 and 18 U.S.C. §1590); Alien Tort Statute (28 U.S.C. § 1350); Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1962(c) and 1962(d)); Fair Labor Standards Act (19 U.S.C. §§201 et. seq.); and state statutes and common law.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction pursuant to 18 U.S.C. § 1595(a), a federal question, this action arising under the Trafficking Victims Protection Act (TVPA), by 28 U.S.C. § 1350, this action arising under the Alien Tort Statute, by 18 U.S.C. § 1964(c), this action arising under the Racketeering Influenced and Corrupt Organizations Act (RICO), by 29 U.S.C. § 216(b), this action arising under the Fair Labor Standards Act (FLSA), by 28 U.S.C. § 1337, this action arising under Acts of Congress regulating commerce, and by 28 U.S.C. § 1331, this action arising under the U.S. Constitution and federal laws. This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

5.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Florida. Venue is also proper pursuant to 18 U.S.C. § 1965.

## PARTIES

6.       Plaintiffs Roy Magnifico, Roma Lim, Rezza Real, Jeanette Halup, Bonifacio Ramos, Lucille Liwag, Ross Ripotola, Raul Rueda, Aries Caluya, Aris Ordonez, Ritche Relampagos, Percival De Quiros, Jose Auingan, Cesar Ramos, Robert Bautista, Arnold Laxamana, Irene David, and Denlit Fausto (collectively, "Plaintiffs") are citizens of the Philippines. Plaintiffs entered the United States lawfully during 2005 and 2006 on H-2B visas to perform labor.

7.       Plaintiffs Roy Magnifico, Jose Auingan, Ritche Relampagos, Bonifacio Ramos, Percival De Quiros, Roma Lim, Aris Ordonez, Lucille Liwag, Jeanette Halup, Robert Bautista, Arnold

Laxamana, Irene David, Denlit Fausto, and Rezza Real (collectively, "Philippines Plaintiffs") were recruited by Defendants in the Philippines.

8.    Plaintiffs Ross Ripotola, Aries Caluya, Raul Rueda, and Cesar Ramos (collectively, "U.S. Plaintiffs") were recruited by the Defendants in Florida.

9.    Defendant Star One Staffing, Inc. (hereinafter "Star One") is a Florida corporation with its principal office located at 2414 Coral Way in Miami, Florida. Upon information and belief, it has operations in at least Florida, New York, and Wisconsin.

10.    Star One is a labor staffing company that, by its own accounts, earned a gross annual income of $8,500,000 during 2006. [1]

11.    Defendant Star One Staffing International, Inc. (hereinafter "Star One International") is a Florida corporation with its principal office located at 2414 Coral Way in Miami, Florida.

12.    Upon information and belief, Star One and Star One International (collectively "Star One Defendants") operated as a single entity.

13.    Although Star One recruitment materials state that Star One International was created "to facilitate recruitment of Filipino nationals to work in the American hospitality industry," documents associated with the recruitment and employment of Philippines Plaintiffs include only the name of Star One.[2]

---

[1] September 6, 2006 letter from Mary Jane Hague to the United States Citizenship and Immigration Service Vermont Service Center.
[2] Star One Staffing International "Welcome to America" brochure; September 6, 2006 letter, *supra* note 1; Star One Staffing, Inc. Application for Alien Employment Certification, Form ETA 750A for ETA Case Number A-06201-11673; September 7, 2006 I-129 visa petition EAC 06-258-51719; Star One Staffing Employment Contract.

14.     Defendant Hague, president of both corporations, appears to use the names interchangeably, as evidenced in various correspondence regarding Plaintiffs, including letters to the Department of Homeland Security.[3]

15.     Upon information and belief, Plaintiffs' timesheets stated "Star One Staffing, Inc. is the agent for the Employee named on the reverse side of this document…All payments for services shall be made to Star One Staffing, Inc. …"

16.     Defendant Mary Jane Hague (hereinafter, "Hague") is President, Treasurer, a director and registered agent of Star One. She is also President, a director and a registered agent of Star One International. Upon information and belief, Hague determined Plaintiffs' places of employment and established the terms of their employment.

17.     Defendant John Carruthers (hereinafter "J. Carruthers") is Chief Financial Officer of Star One. He is also Secretary, Treasurer and a director of Star One International. Upon information and belief, J. Carruthers determined Plaintiffs' places of employment and established the terms of their employment.

18.     Defendant Ruth Carruthers (hereinafter "R. Carruthers") is Vice President, Secretary and a director of Star One.

19.     Defendant Roberto Villanueva (hereinafter "Villanueva") was an agent, employee and representative of Star One Defendants at all times relevant to this action. Upon information and belief, Villanueva was Vice President of the International Division of Star One. Upon

---

[3] November 30 and December 31, 2007 letters from Mary Jane Hague to the United States Citizenship and Immigration Service Vermont Service Center; October 18, 2006 email from Mary Jane Hague to Nonimmigrant Visa Chief, Joseph Tilghman. January 10, 2008 letter from Mary Jane Hague to Lilian Cueva.

information and belief, Villanueva selected Plaintiffs' places of employment, established the terms of their employment, controlled their work schedules and supervised their work.

20.     Defendant Redelina Fernandez (hereinafter "Fernandez") was an agent, employee and representative of Star One Defendants at all times relevant to this action. Upon information and belief, Defendant Fernandez controlled Plaintiffs' work schedules and supervised their work.

21.     At all times relevant to this action, each of the above-named Defendants was an employer of each Plaintiff within the meaning of the Fair Labor Standards Act, 29 U.S.C. § § 201 *et seq.*, Fla. Stat. § 448.109(1)(a) and New York Labor Law, N.Y. Lab. L. § § 190 *et. seq.* and 650 *et. seq.*

22.     At all times relevant to this action, Plaintiffs were "employees" of each Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C. § § 201 *et seq.*, Fla. Stat. § 448.109(1)(a) and the New York Labor Law, N.Y. Lab. L. § § 190 *et. seq.* and 650 *et. seq.*

23.     At all times relevant to his action, Plaintiffs were engaged in commerce, the production of goods for commerce, and/or were employed in enterprises engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § § 206(a) and 207(a).

24.     As detailed in Paragraphs 9 through 21, at all times relevant to this action, Star One Defendants constituted a unified operation, were under common control for a common business purpose, had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and had an aggregate annual gross volume of business of at least $500,000.

25.     Upon information and belief, at all times relevant to this action, the country clubs, banquet hall, and hotels listed in Paragraphs 278 and 282 were each an enterprise with employees engaged in handling, selling, or otherwise working on goods or materials that have

6

been moved in or produced for commerce by any person, and each had an aggregate annual gross volume of business of at least $500,000.

## STATEMENT OF FACTS

### Human Trafficking among Filipino Migrants

26.    According to the recently released U.S. State Department's 2010 Trafficking in Persons Report, "[a] significant number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary servitude."[4]

27.    The Philippines is the world's third-largest source of international migrant labor.[5] Overseas Filipino Workers (OFWs) comprise 4% of the Filipino population and 10% of the Filipino workforce,[6] and number four[7] to five million.[8]

28.    Unfortunately, "[a] significant number"[9] of overseas Filipino workers end up in trafficking situations; in situations of forced labor and involuntary servitude.  "Trafficked Filipino migrant workers [are] often subject to violence, threats, inhumane living conditions, non-payment of salaries, and withholding of travel and identity documents."[10]  The perception that widespread corruption seriously undermines the Philippines government's ability to

---

[4] UNITED STATES DEPARTMENT OF STATE, THE 2010 TRAFFICKING IN PERSONS (TIP) REPORT, Philippines (Tier 2 Watch List), (2010), [hereinafter 2010 TIP REPORT], *available at* http://www.state.gov/documents/organization/142979.pdf.

[5] INTERNATIONAL ORGANIZATION FOR MIGRATION, MIGRATION INITIATIVES APPEAL 2009 – PHILIPPINES, *available at* http://www.iom.int/jahia/webdav/shared/shared/mainsite/activities/countries/mi/philippines.pdf.

[6] UNITED STATES DEPARTMENT OF STATE, PHILIPPINES COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES-2009, Trafficking in Persons (2010), [hereinafter DEPARTMENT OF STATE, 2009 PHILIPPINES REPORT], *available at* http://www.state.gov/g/drl/rls/hrrpt/2009/eap/136006.htm.

[7] DEPARTMENT OF STATE, 2009 PHILIPPINES REPORT.

[8] CENTRAL INTELLIGENCE AGENCY, THE WORLD FACTBOOK, PHILIPPINES, Economy (2010), [hereinafter CIA WORLD FACTBOOK], *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/rp.html.

[9] 2010 TIP REPORT.

[10] 2010 TIP REPORT.

effectively address trafficking[11] contributes to overseas workers' own sense of vulnerability to threats and complete control by their traffickers and prevents them from feeling safe enough to report their traffickers' activities or return to the Philippines.

**Defendants' Exploitation and Trafficking of Guestworkers from the Philippines**

29.     During 2006, Defendants, directly and through their agents, recruited Plaintiffs, as well as other individuals, from both the Philippines and within the United States to perform work in the United States.

30.     Defendants recruited guestworkers from the Philippines under the H-2B visa program. During the recruitment, Defendants provided Philippines Plaintiffs and other Star One recruits with false and misleading information about the terms and conditions of their employment and required them to incur significant debts. Defendants also misled the U.S. government by providing inaccurate information on the H-2B visa applications and Department of Labor certification forms submitted for Philippines Plaintiffs, including the location and amount of work and pay.

31.     Defendants also recruited a small number of Filipino guestworkers already lawfully present in Florida by misleading them about Star One's ability to secure visas for them, as well as providing false and misleading information about the terms and conditions of their employment with Star One.

32.     Defendants created an atmosphere of complete control by representing to Plaintiffs their apparent influence on officials in the United States and Philippines.

33.     Defendants introduced Plaintiffs to a U.S. judge, congressional staffer, Filipino Labor Attaché, and police officer who were all introduced as friends and/or relatives of Defendants.

---

[11] *See* 2010 TIP REPORT.

8

Defendants also made claims about their relationships to officials in the Philippines, including within the U.S. Embassy. Defendants used these relationships to create feelings of both fear and helplessness in Plaintiffs.

34.     Defendants first took Plaintiffs to south Florida to work. Plaintiffs were obliged to reside in severely overcrowded staff houses that were strictly controlled by Defendants in Miami and Boca Raton. Nearly all of the Plaintiffs were later transported by Defendants to work in New York. The housing conditions there were no different from those in Florida, with severe overcrowding and control of Plaintiffs' movements. In both states, Plaintiffs were employed in country clubs and hotels. Their assigned jobs ranged from kitchen and wait staff to security, bartending, and driving shuttles.

35.     Once employed by Star One, Plaintiffs were monitored, intimidated, threatened, forced to live in unsafe and severely overcrowded housing, and frequently provided insufficient food.

36.     Defendants required Plaintiffs to work in conditions, locations and positions different than those contained in Defendants' H-2B visa applications.

37.     At times, Defendants failed to provide Plaintiffs with any work at all and, more frequently, Defendants required Plaintiffs to work long hours, threatening Plaintiffs who dared to admit they needed time off. Defendants also underpaid Plaintiffs and charged them exorbitantly high fees for housing, food and transportation.

38.     In order to maintain their control, Defendants threatened Plaintiffs with arrest, deportation, jail, and cancellation of their visas.

39.     As a result of Defendants' conduct, Plaintiffs suffered serious emotional and financial distress, harm to their immigration status, and ongoing disruption to their lives.

40.     Potentially dozens of Defendants' employees, including Plaintiffs, eventually had to escape from the conditions of coercion and control imposed on them by Defendants.

**<u>Fraudulent Recruitment of Philippines Plaintiffs by Defendants</u>**

41.     During 2006, Defendants sought and obtained H-2B visas to bring workers from the Philippines to the United States.

42.     Upon information and belief, Defendants fraudulently obtained H-2B visas by misrepresenting the pay, location, and type of work guestworkers would perform, including Plaintiffs Auingan, De Quiros, Real, Magnifico, B. Ramos, Bautista, David, Fausto, Laxamana and Ordonez.

43.     Star One's Application for Alien Employment Certification, a form that must be submitted to the U.S. Department of Labor in order to secure H-2B guestworkers, signed by Defendant Hague on February 28, 2006, stated that the 31 guestworkers sought would be employed as waiters and waitresses at Boca Woods Country Club.[12]

44.     On the same form, Defendant Hague also certified that each employee would work one shift per day, five days per week during the period of May 1, 2006 to January 30, 2007.

45.     On Star One's September 7, 2006 Petition for Nonimmigrant Workers, submitted to U.S. Citizenship and Immigration Services, Defendant Star One similarly certified that Plaintiffs Auingan, De Quiros, Real, Magnifico, B. Ramos, Bautista, David, Fausto and Ordonez would work at Boca Woods Country Club as waiters and work full-time, earning $271.12 per week.[13]

---

[12] Application for Alien Employment Certification, *supra* note 2.
[13] I-129 visa petition, *supra* note 2.

46.     However, once they arrived in Florida, Star One did not employ any of the Plaintiffs listed in Paragraph 45 at Boca Woods Country Club.[14]

47.     Upon information and belief, Defendants violated U.S. immigration law by failing to file the Form I-129 Petition for Change of Employer to the U.S. Citizenship and Immigration Services for each new site where they employed Plaintiffs.[15] Instead, Philippines Plaintiffs were forced to accept jobs at new sites and were thus forced to work without legal authorization, displacing qualified U.S. workers.

48.     Upon information and belief, Defendants failed to comply with the work schedules and job duties promised, and failed to place Philippines Plaintiffs with the employers they identified on the visa applications Star One submitted to the U.S. government.

49.     As detailed below, Defendants employed Plaintiffs listed in Paragraph 45 in other types of positions. For example, Plaintiff B. Ramos was assigned to be a security guard and Plaintiff Fausto was assigned to drive a golf cart.

50.     Defendants Hague, R. Carruthers, Villanueva, and Fernandez, along with Judge Andrew Hague, traveled to the Philippines to secure workers for Star One.

51.     Upon information and belief, while in the Philippines, on October 13, 2006, Defendant Hague's husband, Judge Andrew Hague, requested a meeting with Ambassador Kristie Kenney to "facilitate the early group Embassy interview" of prospective Star One employees, including Philippines Plaintiffs De Quiros, Lim, Magnifico, Ordonez, B. Ramos, Bautista, David, and Fausto.[16]

---

[14] March 2, 2007 letter from James R. Calhoun, General Manager and COO of Gulf Stream Bath and Tennis Club regarding the employment of Plaintiff Ordonez through Star One Staffing.
[15] 8 C.F.R. § 214.2(h)(2)(i)(D).
[16] October 13, 2006 email from Judge Andrew Hague to U.S. Ambassador to the Philippines, Honorable Ambassador Kristie Kenney.

52.     While in the Philippines, Defendant Hague held out Andrew Hague as a judge in her dealings with U.S. officials with regard to Star One.[17]

53.     In an email to Nonimmigrant Visa Chief Joseph Tighman of the U.S. Embassy in the Philippines, Defendant Hague wrote that she had "come to Manila with my partner, Ruth Carruthers and my husband, Judge Andrew Hague, for the express purpose of personally meeting you and requesting your assistance in granting a group interview for thirty (30) applicants whose H-2B petitions were recently approved…"[18]

54.     In that same email Defendant Hague referred to Defendant Villanueva as "one of our other partners."[19]

55.     Defendants utilized J.E.S. International Manpower Corporation ("J.E.S."), a labor recruitment and training company located in the Philippines, as their agent to facilitate the recruitment and training of Filipino nationals to work for Star One in the United States.

56.     Hague executed a "Special Power of Attorney" designating J.E.S. as Star One's legal representative for a variety of purposes, including the execution of employment contracts and the representation of Star One before any government, private office or agency in the Philippines "for the purpose of recruiting, hiring and employment of Filipino Workers."

57.     In an August 27, 2006 letter from Hague to the POEA, Hague identified J.E.S. as one of Star One's agents for the purposes of recruitment.[20]

58.     According to a certification issued by the POEA, Star One Staffing was registered to J.E.S. from November 2, 2006 until November 2, 2010.[21]

---

[17] October 18, 2006 email from Mary Jane Hague to Nonimmigrant Visa Chief, Joseph Tilghman.
[18] Id.
[19] Id.
[20] August 27, 2006 letter from Mary Jane Hague to the Philippine Overseas Employment Administration.

59. Star One's employment contracts with Philippines Plaintiffs identify J.E.S. as the agent representing Star One in the Philippines.

60. Defendants Villanueva, Fernandez, and Hague and Judge Andrew Hague visited J.E.S.' facilities and met with prospective Star One employees in the Philippines during approximately April through October 2006.

61. Defendants Villanueva, Fernandez, and Hague directly participated in the recruitment of, and securing of visas for, Philippines Plaintiffs and other prospective employees to work for Star One.

62. During the recruitment process and subsequent employment of Plaintiffs, Defendant Villanueva acted as an agent, employee, and representative of Star One Defendants, as well as Vice President of the International Division of Star One.

63. Upon information and belief, Star One Defendants employed Defendant Villanueva to recruit Plaintiffs from the Philippines, arrange their housing in the United States, coordinate for their positions in various country clubs and hotels, and schedule each employee's hours.

64. At all times relevant to this action, Defendant Villanueva and Defendant Fernandez were acting within the scope of their employment as agents, employees, and representatives of Star One Defendants.

65. Defendant Villanueva interviewed each Philippines Plaintiff prior to offering them a position with Star One.

66. Defendant Villanueva also met with the Philippines Plaintiffs in the Philippines periodically throughout their recruitment and hiring process, which lasted from approximately April through November 2006.

---

[21] November 10, 2006 Certification of the Philippine Overseas Employment Administration.

67.    During these meetings, most of the Philippines Plaintiffs were introduced to multiple agents and officers of Star One, including Defendants Villanueva, Fernandez, Hague and R. Carruthers.

68.    Defendant Fernandez participated in some of the meetings Defendant Villanueva held with Philippines Plaintiffs.

69.    During the recruitment of Philippines Plaintiffs and other guestworkers, Defendant Hague knowingly provided false information to government officials about the amount and type of work, wages and benefits offered by Star One Defendants.

70.    In a "Request for Manpower" from Hague sent to the POEA and Batarilan, president of J.E.S., Hague stated that 56 wait staff were needed to work for Star One in the United States and listed the following the terms and conditions, among others:

    a.  Free food and accommodation;

    b.  Free transportation from accommodation to the site of work;

    c.  Visa and initial medical or physical exam fees, labor card, and all other fees, if any, will be paid by the company.[22]

71.    During multiple meetings organized by J.E.S., in order to induce Philippines Plaintiffs to work for Star One, Defendant Villanueva knowingly provided them false and/or misleading information about the amount and type of work, wages, and benefits offered by Star One. Examples of such information include:

    a.  Defendant Villanueva informed Philippines Plaintiffs B. Ramos, Liwag, Laxamana and Ordonez that Star One would eventually sponsor them for a "green

---

[22] August 27, 2006 letter from Mary Jane Hague to the Philippine Overseas Employment Administration.

card," or lawful permanent residency in the United States, if they were deemed good employees.

b. Defendant Villanueva informed Philippines Plaintiffs that they would be provided free housing, food and transportation while employed by Star One.

c. Defendant Villanueva informed Plaintiffs Lim, Auingan, Relampagos, B. Ramos, Fausto, Halup, Liwag, Real, Ordonez, Fausto and David that Star One would provide them with a regular allowance throughout their employment.

d. Defendant Villanueva told Philippines Plaintiffs that their regular work hours would be eight hours per day.

e. Defendant Villanueva told Philippines Plaintiffs they would have ample opportunity to work in the United States, including overtime hours.

f. Defendant Villanueva told Philippines Plaintiffs that there were jobs already awaiting them in the United States.

g. Defendant Villanueva told Philippines Plaintiffs that they would be employed only as waitresses and waiters.

72.     By inducing Philippines Plaintiffs and other recruits to accept employment with Star One, the misrepresentations made by Defendant Villanueva served one of the purposes for which he was employed by Star One Defendants.

73.     From approximately April through November of 2006, Defendants offered Philippines Plaintiffs, along with other Filipino nationals, jobs in the United States.

74.     As a result of the misrepresentations made by Defendants, each Philippines Plaintiff accepted Defendants' offer of employment, nearly all of them undertaking significant debt,

foregoing other employment opportunities and leaving their families to earn a livelihood working for Star One.

75.     For example, Plaintiff Bautista left his employment of approximately 13 years in Saipan, purchased a plane ticket, and traveled to the Philippines to work for Defendants.   Plaintiff Laxamana left his employment of approximately 11 years in Saipain, purchased a plane ticket and traveled to the Philippines to work for Defendants. Plaintiff David left her employment of over 10 years to work for Defendants.

76.     Philippines Plaintiffs were required to incur significant expenses to secure employment with Star One.

77.     The required recruitment fees and employment-related expenses were so high that nearly all Philippines Plaintiffs had to enter into debt in order to pay them.

78.     Some of Philippines Plaintiffs' expenses included travel expenses and uniforms.

79.     The mandatory fees included: an agency recruitment fee paid to J.E.S., attorneys' fees paid to a lawyer selected by J.E.S., medical examination fees, visa application fees, and a fee paid to the Philippines Overseas Employment Agency ("POEA"), a Philippine government agency.   Plaintiffs Lim, Relampagos, Liwag, Real, Fausto and Halup were required to pay fees for training and certification in food and beverage services.

80.     Generally, fees paid by each of the Philippines Plaintiffs totaled between approximately $2,500 and $3,000. This amount was nearly equivalent to the average 2006 annual income of a family in the Philippines.[23]

---

[23] According to the Philippines' census data, the income of an average family of 4 was 174,000 Philippines pesos, or approximately $3,391.

81.     While Philippines Plaintiffs were required by J.E.S. to pay them a fee of approximately 7,000 Philippine pesos, allegedly for the POEA, the receipts from the POEA, provided by J.E.S., reflected payments of only one-third to one-half of that amount.

82.     Defendants never reimbursed Philippines Plaintiffs for any of the fees or other expenses related to their recruitment and employment with Star One.

83.     Defendants required Plaintiffs to provide them with detailed personal information, including: their personal address, their "provincial address," place and date of birth, and height and weight. In addition, for their spouse and each child or other dependent, most Plaintiffs were required to provide their name, date of birth, work address and telephone number. Some also provided this information for siblings or parents.

84.     Prior to their departure for the United States, Defendants, through their agents J.E.S. or Defendant Villanueva, required Philippines Plaintiffs to sign contracts with Star One.

85.     The written contracts given to Philippines Plaintiffs stated that they would receive an hourly wage of $6.78 per hour and an overtime wage of $10.17 per hour for each hour over eight worked each day, and free transportation to the site of employment.

86.     The written contracts did not include several important promises previously made to Philippines Plaintiffs by Defendants, including those relating to free food, housing or monthly allowances.

87.     Defendants gave Philippines Plaintiffs Lim and Liwag very little time to review their contracts and provided the contracts within one day of their scheduled flights to the United States.

88.     Philippines Plaintiffs, including Plaintiffs Magnifico and David, inquired about the significant differences between the promises Defendants made previously and the Star One contracts. In response, Defendant Villanueva assured them that the promises would be honored.

89.     Defendant Villanueva told Plaintiff Magnifico that his contract did not reflect the oral promises because Star One did not want to pay as many taxes to the United States government.

90.     Defendant Villanueva told Plaintiff David that the contract was drafted quickly and solely for the "labor department" in the Philippines. As with other Philippines Plaintiffs, Defendant Villanueva assured her that the contract would be revised to reflect the promises he had made once she arrived in the United States.

91.     Defendant Villanueva told Philippines Plaintiffs, including Plaintiffs Halup, Bautista and Fausto that the contract was just a formality for government officials, and new, accurate contracts would be provided in Florida.

92.     Defendants, directly and through their agents at J.E.S., told Plaintiffs Ordonez, Auingan, Magnifico, Relampagos, and Liwag that the Star One contracts were created only to show to immigration officials at the airport, and that the previous promises made to them would be included in their real and accurate contract which they would receive once they arrived in Florida.

93.     Plaintiffs De Quiros, Lim, Ordonez, Magnifico, Auingan, Relampagos, Bautista, B. Ramos, David, Fausto and Laxamana arrived in the United States in late November 2006.

94.     Plaintiffs Liwag, Halup, and Real arrived in the United States on approximately December 4, 2006.

**Fraudulent Recruitment of Plaintiffs from the United States**

95.     Plaintiffs Ripotola, Caluya, Rueda, and Cesar Ramos, all Filipino nationals, came to the United States between late 2005 and early 2006 with H-2B visas to work for employers unrelated to Star One.

96.     Defendant Villanueva sought out and recruited U.S. Plaintiffs to work for Star One, although they were lawfully employed by other entities, including his own brother's company.

97.     During early 2006, while they were working at clubs and hotels in South Florida, Defendant Villanueva visited U.S. Plaintiffs to attempt to convince them to work for Star One.

98.     As part of his efforts to impress U.S. Plaintiffs, Defendant Villanueva introduced Plaintiffs Caluya and Rueda to Defendant Hague and to Ted Ravelo (hereinafter "Ravelo"), an agent, employee, and human resources coordinator for Star One.

Misrepresentations Regarding Conditions of Employment

99.     In order to induce U.S. Plaintiffs to work for Star One, Defendant Villanueva knowingly provided them false and/or misleading information about the amount and type of work, wages, and benefits offered by Star One. Examples of such information include:

      a.  Defendant Villanueva promised Plaintiff Ripotola that he would eventually get him a job in the healthcare field, as Plaintiff Ripotola was a trained physical therapist in the Philippines.

      b.  Defendant Villanueva informed U.S. Plaintiffs that they would be provided free housing, food, and transportation while employed by Star One.

      c.   Defendant Villanueva informed U.S. Plaintiff Caluya that he would be provided a monthly allowance.

      d.  Defendant Villanueva informed U.S. Plaintiffs that, if they worked for Star One, he would get them better jobs, work as waiters, and pay of $7 an hour.

<u>Misrepresentations Regarding H-2B Visas</u>

100.    Defendant Villanueva also made numerous misrepresentations regarding U.S. Plaintiffs' visas, including that he could help renew their current H-2B visas.

### *U.S. Plaintiff C. Ramos*

101.    In an attempt to recruit U.S. Plaintiff C. Ramos, Defendant Villanueva informed him that Star One would provide higher hourly wages than his current work and improved housing.

102.    Defendant Villanueva also informed Plaintiff C. Ramos that Star One would renew his H-2B visa, which was due to expire at the end of April 2006.

103.    Defendant Villanueva told Plaintiff C. Ramos that only Villanueva and Star One could renew his visa.

104.    Defendant Villanueva told Plaintiff C. Ramos that he could work for Star One while his visa renewal application was pending, and that Star One would protect him from immigration officials.

105.    Defendant Villanueva informed Plaintiff C. Ramos that Star One would file a residency petition on his behalf to secure him lawful permanent residency.

### *U.S. Plaintiff Ripotola*

106.    Defendant Villanueva informed Plaintiff Ripotola that he would renew Ripotola's existing H-2B visa before it expired on June 30, 2006.

107.    Defendant Villanueva told Plaintiff Ripotola that Ripotola had to travel to New York to work for Star One during June 2006 so that Star One could determine whether his work met Star One and the country club's standards before they could petition for him.

108.    Defendant Villanueva further informed Plaintiff Ripotola that, if a visa could not be secured prior to the expiration of his existing visa, Defendant Villanueva would purchase him a

return plane ticket to the Philippines so that Star One could petition for a visa for him from the Philippines.

109.    Defendant Villanueva repeatedly told Plaintiff Ripotola that Villanueva was the only person who could secure him a new visa.

110.    Defendant Villanueva informed Plaintiff Ripotola that Star One would file a residency petition on his behalf to secure him lawful permanent residency.

111.    As a result of Defendant Villanueva's misrepresentations regarding Star One' ability to renew Plaintiff Ripotola's visa, Plaintiff Ripotola signed a contract to work for Star One in approximately May 2006 and traveled to New York to work as required by Defendant Villanueva.

112.    At the end of June 2006, Plaintiff Ripotola asked Defendant Villanueva for his promised plane ticket to return to the Philippines before June 30.  Defendant Villanueva informed Plaintiff Ripotola that he had an 18-day grace period to lawfully remain in the U.S. after his visa expired.

113.    Defendant Villanueva further assured Plaintiff Ripotola that he would secure Plaintiff Ripotola a new visa.

114.    In reasonable reliance on Defendant Villanueva's continued misrepresentations and the fact that he could not afford to pay for his own return flight to the Philippines, Plaintiff Ripotola felt he had no choice but to remain in the United States and continue to work for Defendants. Plaintiff Ripotola believed that Villanueva was the only person who could secure him lawful immigration status again.

*U.S. Plaintiffs Caluya and Rueda*

115.    During his attempts at recruitment, Defendant Villanueva informed U.S. Plaintiffs Caluya and Rueda that Star One would pay for their travel back to the Philippines if necessary.

116.     Although Plaintiffs Rueda and Caluya's H-2B visas were expiring on April 30 2006, Defendant Villanueva assured them that he had already begun the process of securing them new H-2B visas to work for Star One.

117.     Defendant Villanueva told Plaintiffs Rueda and Caluya that they could continue working while their new visas were being processed and, if they were asked for work authorization documentation by the police or immigration officials, they needed only to provide the copy of Star One's receipt for the visa petition.

118.     Defendant Villanueva informed Plaintiffs Caluya and Rueda that Star One would file a residency petition on their behalf to secure them lawful permanent residency.

119.     As a result of the misrepresentations made by Defendants, each U.S. Plaintiff accepted Defendants' offer of employment, foregoing other employment opportunities, to work for Star One.

120.     By inducing U.S. Plaintiffs to accept employment with Star One, the misrepresentations made by Defendant Villanueva served one of the purposes for which he was employed by Star One Defendants.

121.     In reliance on Defendants' false representations regarding Star One's ability to secure them visas to permit them to continue to work lawfully, as well as their ability to work lawfully for Star One while their visa petitions were pending, U.S. Plaintiffs remained in the United States, inadvertently lost their lawful immigration status, and worked for Star One.

122.     As described in Paragraph 83, *supra*, U.S. Plaintiffs were also required to provide Defendants with information about themselves and their families.

123.     By the beginning of June 2006, each of the U.S. Plaintiffs had been required to sign a contract with Star One.

124.    None of the U.S. Plaintiffs were given copies of the Star One contracts they were required to sign.

### Defendants' Coercion and Control of Plaintiffs

125.    After using false and misleading promises about their employment to entice Plaintiffs into debt and, in some cases, out of legal status to work for Star One Defendants, Defendants used a variety of tactics to exercise control over Plaintiffs and coerce them to work, increasing their intensity as employees sought to escape.

126.    Defendants gained and maintained control over Plaintiffs by actively promoting the impression that they wielded power and influence within the U.S. and Philippine governments and within Philippine and U.S. society, and that those who did not obey them would be made to suffer the consequences, such as arrest and deportation or revocation of immigration status.

127.    Defendants increased the pressure on Plaintiffs, newly arrived to the United States, by ensuring that they remained isolated and marginalized from the alien society around them.

128.    Defendants also used false promises of visa renewal and permanent legal status to retain Plaintiffs and maintain control over them.

129.    Defendants also held critical immigration documents of some Plaintiffs, deliberately increasing their sense of powerlessness to leave.

130.    In addition to using verbal abuse, Defendants exercised their control over Plaintiffs and forced them to work constantly by regularly leveling threats of arrest, deportation, blacklisting, lawsuits, and visa cancellation against Plaintiffs.

### Representations Regarding Relationships to U.S. & Philippine Government Officials

131.    Defendants, directly or through their agents, made numerous representations to Plaintiffs regarding their close relationships to powerful figures in the United States and Philippines, including Florida police, a Florida judge, and government officials in both countries.

132.    Defendants' representations caused Plaintiffs to view Defendants as legitimate and powerful and, as time progressed, reinforced their feelings of fear and helplessness in the face of Defendants' coercion and control.

### *North Miami Police Officer*

133.    A North Miami police officer regularly visited Defendants Villanueva and Fernandez in Defendants' Miami staff housing.

134.    Defendants Villanueva and Fernandez informed Plaintiffs that they had a close personal relationship with this police officer.

135.    During his apparently social visits to their house, the officer was usually in his police uniform and traveling in a police vehicle.

### *Florida Judge*

136.    Defendants Villanueva and Fernandez informed Star One employees, including nearly all of the Plaintiffs, that the owner of Star One's husband was a Florida judge ("Judge Hague").

137.    Upon information and belief, Judge Hague was the husband of Defendant Hague during the relevant time period.

138.    Judge Hague is a judge in the Eleventh Judicial Circuit of the State of Florida.

139.    Some Philippines Plaintiffs were introduced to Judge Hague during their recruitment and hiring by Star One in the Philippines.

140.     Defendant Villanueva told Plaintiff Caluya that Judge Hague was knowledgeable about the law, so there was no reason to worry about the processing of Caluya's visa, but that if Caluya

left Star One, Judge Hague could help Star One file a complaint to stop the processing of his visa application.

### *U.S. Consular Official*

141.    During their recruitment in the Philippines, Defendant Villanueva repeatedly informed Star One recruits, including Philippines Plaintiffs Laxamana, Ordonez, Magnifico, Lim, Real, Relampagos, Halup, Fausto and Liwag, that Judge Hague had a friend in the U.S. Embassy in the Philippines.

### *Deputy Director for U.S. Congressman*

142.    Defendants introduced Plaintiffs B. Ramos, Rueda, Ripotola, Caluya, Halup, Lim, Real, Liwag, and De Quiros to Ernesto Ramos, Deputy District Director for U.S. Representative Kendrick Meek, from the 17th District of Florida.

143.    Defendants, through their agent J.E.S., showed Plaintiffs Real, Liwag, and Auingan, an email sent by Ernesto Ramos to Nonimmigrant Visa Chief Tilghman on behalf of Star One's visa petition.[24]

### *Philippine Labor Attaché*

144.    During the winter of 2007, a Star One employee sought the assistance of Florenda Herrera, the Labor Attaché of the Philippines Embassy. When she visited Defendants' staff housing in Boca Raton, Ravelo informed residents of the house, including Plaintiffs Real, Magnifico, Bautista, and C. Ramos, that she was his friend

145.    Despite their complaints and Star One's subsequent investigation by the New York Attorney General, Plaintiffs never saw any evidence that Labor Attaché Herrera took any action on their behalf.

---

[24] October 18, 2006 email from Ernesto Ramos to Joseph Tilghman.

*Influence in the Philippines*

146.    In the presence of Plaintiffs Ordonez and Magnifico, Defendant Villanueva stated that his family knew murderers-for-hire in the Philippines.

147.    In the presence of Plaintiffs Ordonez and Magnifico, Defendant Villanueva stated that his family knew people who could be hired to hurt or harass people in the Philippines.

148.    Defendant Villanueva informed Plaintiffs Lim, Ordonez, Rueda, Ripotola, Real, Auingan, B. Ramos, Magnifico, Liwag, Bautista, and C. Ramos and other Star One employees that he had influence and power in the Philippines.

*Additional Connections*

149.    Defendant Villanueva told Plaintiffs that Ravelo was the President of the Filipino Community Association of Florida.

150.    Defendant Villanueva informed Plaintiffs Caluya and Lim that he had a friend who was an immigration officer.

Attempts to Isolate Plaintiffs

151.    At the start of their employment with Star One, Ravelo and Defendants Villanueva and Fernandez discouraged Plaintiffs from contacting anyone outside of Star One, particularly people in the local Filipino community.

152.    Ravelo and Defendants Villanueva and Fernandez warned Plaintiffs not to talk to other Filipinos, explaining to some Plaintiffs that Filipinos could not be trusted, were bad people, and would give them false information.

Control over Plaintiffs' Movement, Activities and Work

*Restrictions on Plaintiffs' Movement*

153.    Before being permitted to leave the Star One housing, Plaintiffs were required to tell an agent of Star One where they were going and how to reach them.

154.    Defendants controlled Plaintiffs' transportation to and from work, directing drivers to pick up and drop off Plaintiffs and their colleagues.

155.    On July 24, 2007, when Plaintiff Real and Star One employee Myra Baldivicio returned to Star One housing later than expected, Ravelo issued a memo saying he had called the police to find them and recommending to Star One that they be forced to return to the Philippines.  In that same memo, Ravelo wrote that their behavior should be treated with "summary severity."

156.    Upon her return, Defendant Villanueva provided Plaintiff Real with a copy of the memo recommending her deportation.

*Verbal Abuse*

157.    Adding to the environment of intimidation and control, Defendant Fernandez regularly yelled and cursed at Star One employees without provocation, including most Plaintiffs.

158.    Defendant Fernandez yelled at Plaintiffs and other Star One employees who requested that they not be assigned to work extra shifts.

159.    Defendant Fernandez once screamed that she would kill Plaintiff B. Ramos.

*Forced Excessive Work*

160.    Defendants required Plaintiffs to work in a variety of roles at hotels, country clubs and banquet halls, including primarily wait staff, kitchen staff, and bartenders. Plaintiffs were also required to work at times as drivers, security guards, bell hops and driving golf carts.

161.    After working a regular shift at one location, Defendants frequently required Plaintiffs to work an additional shift at either the same or another location. On Plaintiffs' days off from one

country club or hotel, Defendants regularly assigned them to work at another site so that Plaintiffs worked up to 7 days per week without a break.

162.    As Defendants controlled Plaintiffs' transportation to and from work, Defendants frequently picked Plaintiffs up at the end of a shift and took them directly to another location for additional shifts.

163.    Defendants Fernandez and Villanueva retaliated against some Plaintiffs and other Star One employees by refusing to assign them any work if they did something Defendants disapproved of, including expressing a desire to take time off or declining to work an extra shift.

164.    Plaintiff Relampagos was not scheduled for work for several weeks in retaliation for complaints he made about wages in approximately March or April 2006.

165.    Defendant Fernandez locked Plaintiff Relampagos out of Star One's staff house in Miami after he declined to work an additional shift in March 2007.

166.    Many Plaintiffs were afraid to complain, even if they were exhausted or sick, for fear that Defendants would retaliate, because they needed to work to afford Defendants' monthly deductions, detailed in Paragraphs 316-320, and pay off their debts in the Philippines.

<u>Abuse and Threatened Abuse of the Legal System</u>

<u>*Threats & Misrepresentations Regarding Visas*</u>

167.    Defendants used misrepresentations, promises and threats regarding visas and immigration status to control Plaintiffs.

168.    As detailed in Paragraphs 99-124, Defendant Villanueva made misrepresentations to U.S. Plaintiffs during their recruitment and throughout their employment regarding Star One Defendants' ability and willingness to provide them with H-2B visas.

169.    Managers at Glen Head Country Club inquired about the status of Plaintiffs Rueda and Caluya's visas on multiple occasions.  Defendant Villanueva assured the managers, as well as Rueda and Caluya, that Rueda and Calyua's visa renewal applications were pending.

170.    In approximately November of 2006, Defendant Villanueva informed Plaintiffs Rueda and Caluya that their visas had been declined and that he was going to appeal.

171.    However, Plaintiff Rueda later saw a Notice of Action from U.S. Citizenship and Immigration Services stating that an appeal was filed on May 23, 2006 by Star One Staffing, indicating that the petition had been denied much earlier and that Defendant Villanueva had been lying to both the managers at the country club and Rueda and Caluya in order to convince them they could continue working.

172.    Among the misrepresentations made to Plaintiffs Ordonez, Caluya, Rueda, Liwag Ripotola, and Bautista, Defendants indicated that they could provide Plaintiffs with a path to lawful permanent immigration status in the United States.

173.    Defendant Villanueva repeatedly threatened Plaintiffs Caluya, Lim, Auingan, Relampagos, Liwag, De Quiros, Magnifico, Halup, Real, Bautista, Laxamana, David, Fausto and Ordonez that Star One would not renew their visas if they failed to comply with Star One's excessive work assignments, detailed in Paragraphs 160-166, which would have rendered them unable to continue working lawfully in the United States and subject them to deportation.

174.    Defendant Villanueva made these threats even though he and other Defendants were clearly violating the H-2B program by forcing Plaintiffs to work at location other than those approved by the US government.

175.     Throughout their employment, Defendant Villanueva informed Plaintiffs and other Star One employees that, if they left Star One, he would cancel their visas and no other employer would hire them.

176.     Plaintiffs were frightened by Defendants' continuous threats, particularly because, as Defendants knew, many were working to pay back the debts acquired to come to the United States and work for Star One.

### *Document Holding*

177.     When Plaintiffs Lim, Auingan, Relampagos, Liwag, B. Ramos, Halup, Magnifico, Real, Bautista, Fausto, Laxamana, David and Ordonez were granted renewal visas during 2007, Defendant Villanueva withheld and refused to provide them their original copies of the I-94 renewals.

178.     The I-94 is the primary proof that an alien is lawfully present in the United States. The document includes a stamp of the date when a non-immigrant is admitted and the date when they must depart. The form instructs the recipient to "retain this permit in your possession." When an individual's visa is renewed, they receive an updated I-94, which is attached to a Form 797 Notice of Action.

179.     During approximately February 2007, Plaintiff Auingan went to get a drivers' license at the insistence of Defendant Villanueva. Defendants' driver and agent, Masiglat, gave Auingan his I-94 outside of the doors of the Department of Motor Vehicles and required him to return it immediately upon exiting the building.

180.     During 2007, Plaintiffs Ordonez, David, Fausto, Auingan, Bautista, and Laxamana went to get identification at the Department of Motor Vehicles. Defendants' driver and agent,

Masiglat, would only give them their I-94s once they were outside of the Department of Motor Vehicles and required them to return them to him immediately upon exiting the building.

181.    Plaintiff De Quiros escaped before his visa was renewed and U.S. Plaintiffs never received visas through Star One.

182.    As a result of having their original immigration and identification documents held, many of the Plaintiffs, including Plaintiffs Lim, David, Auingan, Relampagos, Liwag, Bautista, Ordonez, Fausto and Halup felt they were unable to leave Star One.

*Threats Regarding Arrest, Detention and Deportation*

183.    Defendants Villanueva and Fernandez made ongoing threats to, and in the presence of, Plaintiffs regarding the arrest, detention, and deportation of any Star One employees who stopped working for Star One.

184.    Defendants Villanueva and Fernandez told Plaintiffs that, if any Star One employees escaped, they would call the police or immigration enforcement to find them.

185.    Defendant Villanueva told Plaintiffs Magnifico and Fausto that they would be handcuffed and escorted to the airport by police if they left.

186.    Defendants Villanueva and Fernandez told Plaintiff Bautista and others that they would be escorted to be deported if they tried to escape and were caught.

187.    Defendants Villanueva and Fernandez told Plaintiffs that, if any Star One employees fled, they could use the employees' social security number to find them wherever they went.

188.    Defendants Villanueva and Fernandez's threats were made on a regular basis, including during Star One staff meetings.

189.    Over time, Star One employees began to escape. Defendants used these incidents to reinforce their threats and control over remaining employees.

190.    Early in Philippines Plaintiffs' employment, during approximately December 2006, one of their co-workers, Caryl Olandesca, escaped during the night.

191.    In reaction to Olandesca's escape, Defendants Villanueva and Fernandez posted a large photocopy of her passport photo on a wall in the Defendants' staff house in Miami with her social security number written across the bottom. Villanueva and Fernandez also informed Star One employees that her escape was reported to the police and that she would be caught and deported.

192.    The day after Olandesca's escape, police came to the staff house.

193.    When Defendants discovered that another Star One employee had escaped, Defendants Villanueva, Fernandez and/or Ravelo required the remaining employees, including Plaintiffs, to attend a staff meeting.

194.    At the meetings, Defendant Villanueva told the remaining workers that he had called immigration enforcement or police and reported the escapee.

195.    Defendant Villanueva told Plaintiffs and other Star One employees that he had "blacklisted" those workers who had already escaped, so they would face negative immigration consequences and be unable to work overseas, and would do the same to any who tried to escape in the future.

196.    Defendant Villanueva stated at a staff meeting that he heard one of the Star One employees had complained about Star One at one of the country clubs where they worked. Defendant Villanueva stated that if employees wanted to leave Star One they could, but that Defendants would report them to immigration and file a complaint against them.

197.    Defendants used the above threats to compel Plaintiffs to work for employers not authorized by their visas.

*Threats of Litigation*

198.   Defendant Villanueva also told Plaintiffs Caluya, Rueda, Lim, Auingan, Liwag, De Quiros, Magnifico, Halup, Real, David, Bautista and Ordonez that Star One could sue them if they violated their contract.

199.   By serving to ensure Plaintiffs' and other guestworkers' compliance with Star One's abusive working requirements and prevent Plaintiffs and other guestworkers from leaving Star One, the threats and other acts of intimidation on the part of Defendants Villanueva and Fernandez served purposes for which Defendants Villanueva and Fernandez were employed by Star One Defendants.

200.   Plaintiffs suffered emotional distress due to both the Defendants' coercive tactics and Plaintiffs' resulting forced labor.

201.   The emotional effects suffered by Plaintiffs include disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

**Defendants Hague and J. Carruthers' Role in the Abusive Working Conditions**

202.   While living in Florida, a group of Star One employees, including Plaintiffs Real, Relampagos, and C. Ramos went to speak with Defendants Hague and J. Carruthers at the Star One offices about their concerns regarding their working and living conditions, including underpayment of wages and their treatment by Defendants Fernandez and Villanueva.

203.   During their meeting, Defendant Hague said she would speak with Defendant Villanueva about the concerns they raised.

204.   When the group returned to the Defendants' staff house in Miami, Ravelo and Defendant Villanueva were waiting outside for them.

205.    Defendant Villanueva told Plaintiff Real he knew she had visited the Star One offices.

206.    Defendant Fernandez told Plaintiff Real that she should kneel down in front of Defendant Villanueva and apologize if she did not want to be sent back to the Philippines.

207.    Defendant Villanueva yelled at Plaintiff Real and told her that he and Ravelo were going to send her back to the Philippines.  He also told her that Defendant Hague did not believe her story.

208.    Plaintiffs are unaware of any actions Defendant Hague took in response to the concerns raised by the Star One employees.

## Substandard Living Conditions

209.    Defendants warehoused Plaintiffs in severely overcrowded housing in both Florida and New York ("Star One Housing").

210.    As detailed below, these single-family houses were unequipped to house the numbers of Star One employees Defendants assigned to them.

211.    While living in the Star One Housing, Plaintiffs and other Star One employees slept on floors, closely packed bunk beds, air mattresses, and in hallways and common areas.

212.    Due to the insufficient number of bathrooms in the Star One Housing, Plaintiffs had to get up several hours earlier than they otherwise would each morning to use the bathrooms. Given the considerable hours Plaintiffs typically worked, being forced to get up early meant Plaintiffs received only a few hours of sleep some nights.

213.    Some Star One employees, including Plaintiffs Laxamana, Bautista, Magnifico, Caluya, Ordonez, Relampagos, Rueda, and Real sometimes had to relieve themselves in containers, outside, or in nearby restaurant restrooms due to lack of access to bathroom facilities.

214.    There was a complete lack of privacy in the severely overcrowded housing required by Defendants.

215.    Defendants, both directly and through their designated agents, controlled the Star One Housing. They or their agents resided in the houses, required Plaintiffs to seek permission prior to leaving, provided the food available in the houses, held mandatory meetings, and monitored Plaintiffs' activity within the house.

216.    Plaintiffs were also required to perform uncompensated work in the Star One Housing, including cleaning, cooking and employment-related trainings.

217.    In addition to the uncompensated work described in Paragraph 216, Defendants required Plaintiffs Laxamana and Bautista to transport Defendants' other employees.

218.    Defendants deducted substantial housing fees, detailed in Paragraph 321-332, from Plaintiffs' pay.

219.    Upon information and belief, during the relevant time period, all Defendants were aware of the number and size of houses available to Defendants' employees, including Plaintiffs, and the approximate total number of Star One Defendants' employees.

<u>Florida Housing</u>

*<u>Miami House I</u>*

220.    Defendant Villanueva brought approximately 13 Star One employees, including U.S. Plaintiffs Rueda and Caluya to his home in the greater Miami-area (hereinafter, "Miami House I"), where he lived with Defendant Fernandez, in approximately March or April of 2006.

221.    Upon information and belief, Miami House I is located at 590 Southwest 23rd Avenue in Miami, Florida.

222.    Upon information and belief, Miami House I was an apartment with one bedroom and one bathroom.

223.    Defendants Villanueva and Fernandez resided in and oversaw the operation of Miami House I.

224.    Miami House I was severely overcrowded and, upon information and belief, violated local and state housing law.

225.    Due to overcrowded conditions in the house, Plaintiff Caluya slept without any mattress on a makeshift bed on the floor and on chairs.

226.    Approximately 15 Star One employees, including Plaintiffs Rueda and Caluya, shared a single bathroom.

## *Miami House II*

227.    Once they arrived in the United States, in later November and early December 2006, the Philippines Plaintiffs were taken to another house in Miami (hereinafter, "Miami House II").

228.    Upon information and belief, Miami House II is located at 14430 Northeast 4th Avenue in Miami, Florida.

229.    After they lived in Miami House I, Defendants Villanueva and Fernandez resided in and oversaw the operation of Miami House II.

230.    Miami House II is a single-family house.

231.    Miami House II is a 3,108 square foot house with five bedrooms and three bathrooms.

232.    Defendants housed up to approximately 40 Star One employees at a time in Miami House II.

233.    Miami House II, was severely overcrowded and, upon information and belief, violated local and state housing law.

234.    Upon information and belief, Miami House II contained five bedrooms, one of which was occupied by Defendants Villanueva and Fernandez.

235.    Miami House II contained three bathrooms, one of which was reserved solely for Defendants Villanueva and Fernandez.

236.    Plaintiffs, along with other Star One employees, were required to sleep on bunk beds in nearly every room in Miami House II, including common areas.

237.    One of the severely overcrowded rooms that some Plaintiffs slept in was an open common area with just a curtain placed across the doorway.

238.    Up to approximately 20 Star One employees, including Plaintiffs Halup, Real and Liwag, sometimes slept in a single room.

239.    Upon information and belief, Ravelo and Defendant Hague visited Miami House II. Ravelo visited two to three times per week to speak with Defendants Villanueva and Fernandez and to check on the staff.

### *Boca House*

240.    Starting in late November and early December of 2006, Defendant Villanueva moved some of the Philippines Plaintiffs, including Plaintiffs Magnifico, B. Ramos, Ordonez, De Quiros, Liwag, Bautista, Laxamana, David, and Relampagos, along with other Star One employees, to a house in Boca Raton ("Boca House").

241.    Upon information and belief, the Boca House is in or near Boca Raton, Florida.

242.    Ravelo resided in and oversaw the operation of the Boca House.

243.    Boca House was a single-family house.

244.    Boca House was severely overcrowded and, upon information and belief, violated local and state housing law.

245.    Defendants Villanueva and Fernandez regularly visited the Boca House to hold Star One staff meetings, deliver food, and monitor Plaintiffs and their co-workers.

246.    Defendant Hague visited the Boca House.

247.    Defendants housed up to approximately 25 Star One employees at a time at the Boca House.

248.    Some of the Plaintiffs, including Relampagos, Ordonez and De Quiros, along with other Star One employees, were required to sleep in the Boca House's common areas, including the hallway.

249.    The Boca House had insufficient bathrooms for the number of people housed there.

250.    As in the Miami House, this meant Plaintiffs had to get up several hours earlier each morning to use the bathrooms.

<u>Transfer of Plaintiffs to New York</u>

251.    Plaintiffs Caluya, Rueda, and C. Ramos were sent to New York by Star One in approximately May 2006.

252.    Plaintiff Ripotola was sent shortly after in approximately June 2006.

253.    In the early spring of 2007, Defendant Villanueva told Philippines Plaintiffs that he would begin transferring them to New York to work in hotels and country clubs there.

254.    Defendant Villanueva threatened Philippines Plaintiffs by stating that Star One would not renew their visas, subjecting them to deportation, if they did not comply with his request to go to New York.  Plaintiffs felt they had no choice but to comply.

255.    In the early spring of 2007, Plaintiff de Quiros was sent to work in New York by Star One.

256.    Between April and June of 2007, Plaintiffs Lim, Ordonez, Magnifico, Auingan, Liwag, Real, Fausto, Bautista, David, and Halup were sent to work in New York by Star One.

257.    During the summer of 2007, Plaintiff Laxamana drove himself and six other Star One employees to New York under Defendant Villanueva's orders.

258.    Before they could be taken to New York, Plaintiffs Relampagos and B. Ramos escaped from Star One during approximately May of 2007.

New York Housing

*Motel*

259.    Upon their arrival in New York, during the late spring of 2006, a group of Star One employees, including Plaintiffs Caluya, Rueda, and C. Ramos were forced to live for several weeks in the Norwick Motel in Oyster Bay, with Defendants Villanueva and Fernandez.

260.    Ravelo stayed at the motel with Defendants Villanueva and Fernandez for a few days during this time.

261.    During this time, fifteen people were required to share two motel rooms and had to cook their meals in the bathrooms with a rice cooker.

262.    Defendants Villanueva and Fernandez required Plaintiffs Caluya and Rueda to ask their permission if they wanted to leave the motel room.

263.    Plaintiffs Caluya and Rueda, along with their Star One co-workers, were restricted to using the back entrance of the motel in order to avoid discovery by motel staff.

*New York Houses*

264.    During the summers of 2006 and 2007, Defendants placed Plaintiffs Ripotola, Rueda, Caluya, Lim, Real, Auingan, Halup, Liwag, Magnifico, De Quiros, Ordonez, David, Bautista and

39

other Star One employees in the following houses in New York (hereinafter "New York Houses").

265.    Upon information and belief, the New York Houses were located at:

       a.  1026 Glen Cove Avenue in Glen Head, New York;

       b.  54A Coolidge Avenue in Roslyn Heights, New York;

       c.  421 Harding Avenue in Roslyn Heights, New York; and

       d.  600A Cedar Swamp Road in Glen Head, New York.

266.    The house on Glen Cove Avenue is a 1,165 square foot, single family house.

267.    The house on Cedar Swamp Road is a 2,889 square foot, single family house.

268.    Defendants, including Villanueva, Fernandez, or one of their designated agents, resided in and oversaw the operation of each of the New York Houses at all times.

269.    The New York Houses were each single-family houses.

270.    Each of the New York Houses was severely overcrowded and, upon information and belief, violated local and state housing law.

271.    Due to overcrowding and lack of sufficient bed space in the New York Houses, some Plaintiffs, including Plaintiff Real, had to sleep on air mattresses on the floors between bunk beds of the New York Houses.

272.    Plaintiff Magnifico, along with other Star One employees slept in a living room.

273.    At times, approximately ten to twenty individuals were forced to share a single bathroom in the New York Houses.

274.    As in the Miami and Boca Houses, this meant Plaintiffs had to get up several hours earlier than they otherwise would each morning to be able to use the bathrooms.

<u>Plaintiffs' Limited Access to Food</u>

275.    Defendant Fernandez directly controlled workers' access to food in each of the Star One Houses where she resided.

276.    Defendant Fernandez primarily purchased the food for Plaintiffs in Florida.

277.    Upon information and belief, Defendant Fernandez determined the quantity and type of food to buy for Plaintiffs and their Star One co-workers in Florida.

278.    Defendants Villanueva and Defendants' agent Masiglat primarily purchased food for Plaintiffs in New York.

279.    Defendant Villanueva and Masiglat determined the quantity and type of food to buy for Plaintiffs and other Star One employees in New York.

280.    Defendant Fernandez monitored the consumption of food by Plaintiffs.

281.    For example, while at Miami House II, Defendant Fernandez told Plaintiff Real that, if she refused to work a double shift, she should not eat food designated for staff getting ready for work.

282.    When Defendant Fernandez caught Plaintiff Real making herself a package of instant noodles, she yelled at Real for eating them without permission.

283.    Defendants' agent, Masiglat, and Defendant Fernandez also asked some Plaintiffs to limit the amount of food that they consumed.

284.    While in New York, Defendants provided increasingly poor quality food that Plaintiffs laxamana, Bautista, Ripotola, Rueda, Caluya, Lim, Real, Auingan, Halup, Liwag, Magnifico, De Quiros, Ordonez were required to prepare for each other. There was sometimes insufficient food for them to eat.

285.    Upon information and belief, Star One Defendants delegated the duties of securing and overseeing housing and food for Plaintiffs and other guestworkers to Defendants Villanueva and

Fernandez, as well as to Ravelo.  Thus, any substandard living conditions imposed directly by Villanueva, Fernandez and Ravelo were carried out in service of one purpose for which they were hired by Star One Defendants.

### Working Conditions & Unlawfully Low Pay

#### Failure to Provide Promised Work

286.    While Defendants certified to the U.S. government and promised Philippines Plaintiffs that there were jobs awaiting them in the United States, many had no regular, full-time work for weeks after their arrival.

287.    When U.S. Plaintiff Caluya joined Star One to work in Miami, he was not provided the work he was promised and stayed in Defendant Villanueva's south Florida house without any work.  He was not provided work by Star One until Defendants moved him to New York approximately one month later.

288.    Despite their promises, Defendants failed to provide Plaintiff Fausto with regular work for approximately two months after her arrival in the United States. During this time, Defendants periodically had her perform work for them in the Star One offices. Defendants charged Fausto for food, housing and transportation each month even during those periods when she was not employed.

#### New York Attorney General Investigation of Wage Violations

289.    The New York Attorney General investigated Defendants including Star One Defendants, and Defendants Hague, R. Carruthers, J. Carruthers and Villanueva violations of New York wage laws from May to December 2006 and April to December 2007.

290.    The New York Attorney General found that Defendants, with the exception of Fernandez who was not a subject of the investigation: (1) made deductions from some Star One employees'

wages for housing food and transportation up to $800.00; (2) failed to pay some Star One employees the required overtime for hours worked in excess of forty in a  week;  (3) failed to pay some Star One employees the required minimum wage; (4) failed to pay some Star One employees wages for hours worked, including but not limited to "training"; (5) failed to pay some Star One employees their wages each week; and (6) attempted to discriminate against some Star One employees.

291.    As a result of the wage investigation, Defendants entered into an agreement with the State of New York, paying $113,454.00 to a settlement fund which was distributed to former Star One employees.

292.    Plaintiffs Ordonez, Auingan, Magnifio, Liwag, Ripotola, Real, Halup, Bautista, Laxamana, David, Fausto and Lim, deemed by the New York Attorney General to be among the employees that Defendants failed to pay properly, accepted payments from the settlement fund. Plaintiffs Caluya, Rueda, C. Ramos, and De Quiros did not accept payments from the settlement fund.

<u>Florida Employment</u>

293.    While in Florida, Defendants assigned each Plaintiff to work at multiple south Florida country clubs and hotels each week, including Eden Roc Renaissance Miami Beach, St. Andrew's Country Club, Mizner Country Club, Marriott South Beach, Fisher Island Club, Broken Sound Club, Fort Lauderdale Grande, Gulf Stream Bath & Tennis Club, High Ridge Country Club, Hamlet Country Club, Boca Rio Country Club, and Indian Creek Hotel.

294.    Plaintiffs worked in Florida for Defendants during approximately the following dates:

    a.    Caluya: Approximately March 2006 to May 2006.

    b.    Rueda: Approximately February 2006 to March 2006.

     c.   Ripotola: Approximately February 2006 to June 2006.

     d.   Magnifico: Approximately November 2006 to April 2007.

     e.   Auingan: Approximately November 2006 to May 2007.

     f.   Liwag: Approximately December 2007 to April 2007.

     g.   De Quiros: Approximately December 2006 to April 2007.

     h.   Real: Approximately December 2006 to April 2007.

     i.   Lim: Approximately November 2006 to April 2007.

     j.   Halup: Approximately December 2006 to April 2007.

     k.   Ordonez: Approximately November 2006 to May 2007.

     l.   Relampagos: Approximately December 2006 to April 2007.

     m.  B. Ramos: Approximately late November 2006 to May 2007.

     n.   C. Ramos:  Approximately November 2006 to May 2007.

     o.   David: Approximately November 2006 to May 2007.

     p.   Laxamana: Approximately November 2006 to July or August 2007.

     q.   Bautista: Approximately November 2006 to April 2007.

     r.   Fausto: Approximately November 2006 to April 2007.

295.   Philippines Plaintiffs' hours in Florida varied but, when employed, they regularly worked over 40 hours per week.

296.   Defendants Villanueva and Fernandez, as well as Ravelo, told Plaintiffs when and where to work.

<u>New York Employment</u>

297.   Once they were in New York, Defendants required Plaintiffs Ordonez, Real, Magnifico, Auingan, Lim, Halup, Liwag, Caluya, Rueda, Ripotola, Fausto, David, Laxamana, C. Ramos,

Bautista and De Quiros to work at multiple New York banquet halls, hotels and country clubs each week, including Fresh Meadow Country Club, Glen Head Country Club, Glen Oaks Country Club, Meadow Brook Country Club, Muttontown Club, Nassau Country Club, North Hill Country Club, Piping Rock Club, Seawane Club, Bonnie Briar Country Club, Northshore Country Club, and Thatched Cottage.

298.   Plaintiffs worked in New York for Defendants during approximately the following dates:

     a.   Caluya: Approximately May 2006 to January 2007.

     b.   Ripotola: Approximately June to November 2006.

     c.   Rueda: Approximately May 2006 to January 2007.

     d.   Magnifico: Approximately May 2007 to the October 2007.

     e.   Auingan: Approximately May 2007 to October 2007.

     f.   Liwag: Approximately April 2007 to October 2007.

     g.   De Quiros: Approximately April to June 2007.

     h.   Real: Approximately April 2007 to October 2007.

     i.   Lim: Approximately April to November 2007.

     j.   Halup: Approximately April 2007 to October 2007.

     k.   Ordonez: Approximately May 2007 to the fall of 2007.

     l.   C. Ramos: Approximately May to November 2006; and May to October 2007.

     m.   Bautista: Approximately April to November 2007.

     n.   Laxamana: Approximately July or August to October 2007.

     o.   David: Approximately May to December, 2007.

     p.   Fausto: Approximately May to December 2007.

299.   Plaintiffs' work hours in New York varied but, when employed, they regularly worked over 40 hours per week.

300.   As in Florida, as agents and employees of Star One Defendants, Defendants Villanueva and Fernandez, as well as Ravelo, told Plaintiffs when and where to work.

Excessive Work Requirements

301.   Defendants generally failed to provide all of the Plaintiffs with sufficient work at the start of each season while later requiring them to work up to approximately 60 and sometimes even over 100 hours per week.

302.   As described in Paragraphs 160-166, Defendants required Plaintiffs to work significant amounts of overtime, taking them directly from one job to another and demanding they work without breaks.

303.   Plaintiff Fausto became ill and required medical attention due to being overworked by Defendants.

Defendants' Failure to Pay Plaintiffs

304.   Plaintiffs were generally paid just once per month.

305.   Defendants sometimes paid Plaintiffs up to two weeks late.

306.   Philippines Plaintiffs, who arrived in Florida around the end of November 2006, did not receive any pay until approximately January 2007.

307.   Plaintiffs were generally paid by direct deposit to their bank accounts.  Philippines Plaintiffs and U.S. Plaintiff Ripotola's accounts were set up at the direction of Defendants.  The remaining Plaintiffs' accounts had been established at the direction of their previous employer.

308.   Plaintiffs were paid from Star One's bank account.

309.   The records of payment issued by Star One were generally signed by Defendant Hague.

310.    Defendants did not consistently provide all U.S. Plaintiffs with records of payment detailing their pay, deductions, and withholdings.

311.    Defendant Villanueva told Plaintiffs Caluya and Rueda that Star One could not issue payment summaries until their visas had been processed.  After Plaintiff Rueda repeatedly questioned Defendant Villanueva about the small payments he was receiving for his work each month, Villanueva provided Plaintiff Rueda with a single payment record for the month of June 2006.

312.    Plaintiff Ripotola was paid inconsistent amounts sporadically and without explanation.

313.    Defendants failed to post the required wage and hour postings as required by Florida, New York and federal law.

314.    Defendants gave Plaintiffs misinformation about their right to overtime pay for all hours worked over 40 each week.

315.    Some Plaintiffs were unaware of their full rights to the applicable federal and state minimum wages and overtime premiums during their employment.

*Unlawful Deductions*

*Costs Associated with Recruitment & Relocation*

316.    In order to be able to commence work for Star One, Philippines Plaintiffs incurred various fees and expenses, as described in Paragraphs 76-82.

317.    Upon information and belief, Philippines Plaintiffs also incurred additional costs for their transportation from their homes in the Philippines and Saipan to J.E.S.' office in Manila.

318.    Defendant Hague informed the POEA and Star One's agent, J.E.S., that Star One would reimburse these expenses.

319.    The expenses identified in Paragraph 316 were primarily for the benefit of Defendants.

320.   Based on the expenses incurred by Philippines Plaintiffs in order to work for Star One, Plaintiffs should have been due an additional amount of pay to reimburse them for the expenses incurred for the convenience of Defendants to the extent that these expenses caused their wages to fall below the legally-required minimums.

*Food, Housing & Transportation Deductions*

321.   Upon information and belief, Defendants deducted hundreds of dollars from U.S. Plaintiffs' wages each month for food, housing, and transportation.

322.   While Philippines Plaintiffs were in Florida, Defendants deducted between $400 and $500 per month from Plaintiffs' pay for housing, transportation and food.

323.   When Defendants failed to provide Plaintiffs Halup, Real, Liwag and De Quiros with any work during their first weeks in the United States, they were still charged a deduction of $400 to $433, putting them into debt with Star One.

324.   Once Philippines Plaintiffs were in New York, Defendants increased the deductions for food, housing and transportation to between $800 and $900 per month.

325.   Defendant Villanueva gave Plaintiffs a variety of excuses when questioned about the housing, transportation and food deductions.

326.   Among those excuses, Defendant Villanueva told some Plaintiffs that the government required these deductions and, if Defendant Star One did not make the deductions, the government would.

327.   Defendant Villanueva told Plaintiff Caluya that Star One made the deductions because their visas had not been processed yet, but that Star One would return the money once the visas were processed.

328.    When Plaintiffs or their Star One colleagues raised concerns about the deductions, Defendant Villanueva also told them they could "take it or leave it."

329.    The Defendant-provided transportation, which the deductions allegedly partly covered, was often overcrowded, meaning there were insufficient seats and seatbelts for some passengers, including Plaintiffs, in violation of the law.

330.    Upon information and belief, the Defendant-mandated housing violated housing standards.

331.    Upon information and belief, the amount Defendants charged Plaintiffs for food exceeded the actual cost.

332.    As a result of all of the deductions and expenses described *supra*, Plaintiffs' pay fell below the relevant state and federal minimum wages as well as the promised hourly wage.

*Unsolicited Payroll Advances*

333.    When insufficient work assignments left some Plaintiffs with paychecks that did not cover their basic needs or Defendants' monthly deductions, Defendant Star One Staffing gave them advances, whether or not the Plaintiffs wanted them.

334.    Upon information and belief, Defendants deposited unsolicited payroll advances in Plaintiffs Magnifico, De Quiros, Halup, Laxamana, B. Ramos, Lim, Auingan, Relampagos, Bautista, Fausto and Liwag's bank accounts and then collected the advances from subsequent paychecks.

335.    When combined with a lack of regular work hours, the deduction of prior payroll advance balances meant that some Plaintiffs received paychecks with negative balances.

*Uncompensated Work*

336.    Defendants sometimes paid Plaintiffs for less than the total number of hours worked.

337.    Upon information and belief, Defendants failed to maintain proper records regarding Plaintiffs' work.

338.    Upon information and belief, Plaintiffs' time records were submitted to Star One Defendants.

339.    Upon information and belief, doubts were expressed by Defendant J. Carruthers regarding the accuracy and/or completeness of Defendants' timekeeping methods.

340.    Defendants required Plaintiffs to perform uncompensated work in Florida and New York, including house and yard work at a home believed to be Defendant Hague's, driving, cleaning and cooking in Star One housing, giving and receiving training that was primarily for the benefit of the employer, and performing administrative tasks for Star One.  Defendant Fernandez also required Plaintiff Fausto to soak and scrub her feet.

341.    Plaintiffs were also not compensated for travel time they spent being transported between job sites once their work day had begun.

*Failure to Provide Tips*

342.    Members and guests of Fisher Island sometimes designated tips for Plaintiff Halup.

343.    Defendants never provided Plaintiff Halup the tips or included them in calculations of her overtime wages.

*Failure to Pay last Month of Work*

344.    Most Plaintiffs did not receive their last paychecks.

*Failure to Pay Minimum, Overtime and Promised Wages*

345.    Defendants failed to pay Plaintiffs the federal and state minimum wage for all hours worked.

346.    Defendants failed to pay Plaintiffs their promised wages.

347.    Defendants failed to pay Plaintiffs the required overtime premium for all hours worked in excess of eight each day, as promised in their employment contracts.

348.    Defendants failed to pay Plaintiffs the required overtime premium for all hours worked in excess of ten each day, as required by New York law.

349.    Defendants failed to pay Plaintiffs the required overtime premium of one and one half times their regular rate of pay for each hour worked in excess of forty each week.

**Plaintiffs' Escapes from Star One**

350.    As a result of Defendants' exploitation and coercion, Plaintiffs' exhaustion, emotional distress and financial hardships became intolerable and they were forced to flee.

351.    Plaintiff Ripotola escaped Star One from New York during approximately November 2006.  Ripotola eventually decided to leave the area altogether because he did not feel he would be safe unless he was far away from Defendant Villanueva.

352.    Plaintiffs Rueda and Caluya escaped Star One from New York during approximately January 2007.

353.    Prior to his escape, Defendant Villanueva told Plaintiff Rueda that, if he left Star One, "something bad" would happen to him and, additionally, he would not receive his pay.

354.    Plaintiff Relampagos escaped Star One from Miami during approximately April or May 2007.

355.    Plaintiff B. Ramos escaped Star One from Miami during approximately May 2007.

356.    Though Plaintiff B. Ramos had been hesitant to attempt escape for fear that Defendant Villanueva would use his social security number to track him, as Villanueva had threatened, he could no longer accept the maltreatment by Defendants and decided escape before being taken to New York.

357.    Plaintiff B. Ramos had memorized telephone numbers he saw on the sides of taxis while being driven to and from work and called a taxi early one morning before anyone else in the house had awoken.

358.    Plaintiff De Quiros escaped from Star One from New York during approximately June 2007.  When he fled, he was only able to grab a few of his belongings.

359.    Plaintiffs Auingan, Halup, Liwag, Real, Ordonez, Laxamana and C. Ramos escaped Star One from New York during approximately October 2007.

360.    Plaintiff Ordonez tried not to alert any of his co-workers he was leaving because he was afraid Defendant Villanueva would find out and call the police or immigration enforcement, as he had claimed to do when other Star One employees had escaped.

361.    After Defendant Villanueva told him he was still $350 in debt, Plaintiff Laxamana escaped in late October, 2007.  At the time of his escape, he was owed approximately three weeks salary.

362.    During October 2007, Plaintiff Magnifico escaped Star One from New York.  Plaintiff Magnifico was similarly anxious about letting other co-workers know that he was planning to leave because he was afraid that someone might report it to Defendant Villanueva.

363.    Plaintiff Real realized that she had to find a way to escape in October 2007 after learning that her paycheck for the prior month totaled approximately $1.50 despite working over 40 hours each week.

364.    During November 2007, Plaintiff Lim escaped Star One from New York.  After working over 40 hours per week for a month, Plaintiff Lim received a paycheck totaling approximately $25.38.  Feeling desperate, and knowing that Defendants' monthly deductions were going to keep her in debt, she was willing to risk Defendants Villanueva and Fernandez's retaliation.

365.     During November 2007, Plaintiff Bautista escaped Star One from New York after receiving a paycheck for only approximately $79.00 for the previous month of work and he was going to be forced by Defendants to return to Florida to work again.

366.     In December of 2007, Plaintiffs David and Fausto escaped after waiting to be paid for the previous month's work.  Plaintiff Fausto's last paycheck was for approximately $66.00. Feeling desperate due to lack of food and transportation and withheld wages, they were only able to leave after borrowing money.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Trafficking Victims Protection Act of 2003 ("TVPA")
Forced Labor, 18 U.S.C. § 1589

*(Defendants Star One, Star One International, Villanueva, Fernandez)*

367.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

368.     Plaintiffs bring this claim against Defendants Star One, Star One International, Villanueva, and Fernandez.

369.     This claim is brought under 18 U.S.C. § 1595 of the Trafficking Victims Protection Act.

370.     Defendants Star One, Star One International, Villanueva and Fernandez subjected Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

371.     Defendants Star One, Star One International, Villanueva and Fernandez knowingly provided and obtained Plaintiffs' labor and services by subjecting Plaintiffs to threats of serious harm of themselves and others, including litigation, blacklisting by the U.S. government, arrest,

detention, deportation by immigration and law enforcement officials, loss of immigration status, and physical harm in the Philippines, in violation of 18 U.S.C. § 1589(2).

372.   By threatening Plaintiffs with litigation, blacklisting by the U.S. government, arrest, detention, deportation by immigration and law enforcement officials, deceiving Plaintiffs about the terms of their visas and Defendants' intent and ability to acquire future visas, and confiscating Plaintiffs' immigration documents, Defendants Star One, Star One International, Villanueva and Fernandez provided and obtained the labor of Plaintiffs through abuse and threatened abuse of law and the legal process in violation of 18 U.S.C. § 1589(3).

373.   Defendants Star One, Star One International, Villanueva and Fernandez knowingly provided and obtained Plaintiffs' labor and services by using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they left Defendants' employ, they or another person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(4).

374.   As a result of the above violations, Plaintiffs suffered damages.

375.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

SECOND CLAIM FOR RELIEF

Trafficking Victims Protection Act of 2003 ("TVPA")
Human Trafficking, 18 U.S.C. § 1590

*(Defendants Star One, Star One International, Villanueva, Fernandez)*

376.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

377.   Plaintiffs bring this claim against Defendants Star One, Star One International, Villanueva and Fernandez.

378.   This claim is brought under 18 U.S.C. § 1595 of the Trafficking Victims Protection Act.

379.     Defendants knowingly recruited, harbored and transported Plaintiffs for the purposes of subjecting them to forced labor in violation of 18 U.S.C. § 1590.

380.     Defendants recruited Plaintiffs from within the Philippines and United States, housed them in Defendant-controlled housing, and transported them throughout Florida and to New York, for the purposes of subjecting them to forced labor.

381.     As a result of the above violations, Plaintiffs suffered damages.

382.     Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

<u>THIRD CLAIM FOR RELIEF</u>

Alien Tort Statute ("ATS")
28 U.S.C. § 1350
Involuntary Servitude and Forced Labor

*(Defendants Star One, Star One International, Villanueva, Fernandez)*

383.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

384.     Plaintiffs, who are all aliens, bring this claim against Defendants Star One, Star One International, Villanueva and Fernandez.

385.     This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

386.     Defendants Star One, Star One International, Villanueva, and Fernandez subjected Plaintiffs to involuntary servitude and/or forced labor, which are violations of the law of nations including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

387.   The Convention Concerning Forced or Compulsory Labor defines forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which said person has not offered himself voluntarily."[25]

388.   The above-named Defendants engaged in acts including, but not limited to, manipulation of legal documents, psychological coercion, abuse and threatened abuse of the legal process, and threats of physical force to exact work or service from the Plaintiffs which the Plaintiffs had not offered voluntarily.

389.   Aiding and abetting involuntary servitude and forced labor is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. § 1350.

390.   Defendants Star One, Star One International, Villanueva, and Fernandez aided and abetted the imposition of involuntary servitude and/or forced labor by directing, ordering, conspiring to commit, or aiding the imposition of involuntary servitude and/or forced labor.

391.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

<u>FOURTH CLAIM FOR RELIEF</u>

Alien Tort Statute ("ATS")
28 U.S.C. § 1350
Human Trafficking

*(Defendants Star One, Star One International, Villanueva, Fernandez)*

392.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

---

[25] Art. 2, May 1, 1932, 39 U.N.T.S. 55

56

393.   Plaintiffs who are all aliens bring this claim against Defendants Star One, Star One International, Villanueva, and Fernandez.

394.   This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

395.   Defendants Star One, Star One International, Villanueva, and Fernandez engaged in human trafficking, which is a violation of the law of nations including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

396.   The leading international instrument on the subject defines human trafficking as:

> [T]he recruitment, transportation, transfer, harboring, or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[26]

397.   Defendants Star One, Star One International, Villanueva, and Fernandez engaged in acts including, but not limited to, the recruitment, transportation, transfer, harboring, or receipt of Plaintiffs.   These acts were conducted through the use of the threat of force, coercion, fraud, deception, and the abuse of power and/or a position of vulnerability.

398.   Defendants Star One, Star One International, Villanueva, and Fernandez trafficked Plaintiffs for the purposes of obtaining forced labor or services.

399.   Aiding and abetting human trafficking is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. § 1350.

---

[26] The Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Crime, art. 1, Nov. 15, 2003, 55 U.N. GAOR Supp. (No. 49) at 60, U.N. Doc. A/45/49 (Vol. I) (2001) 40 I.L.M. 335.

400.    Defendants Star One, Star One International, Villanueva, and Fernandez aided and abetted human trafficking by directing, ordering, conspiring to commit, or aiding human trafficking.

401.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

<u>FIFTH AND SIXTH CLAIMS FOR RELIEF</u>

Racketeer Influenced and Corrupt Organizations Act
18 U.S.C. § 1962(c) and 18 U.S.C. § 1692(d)

Florida Civil Remedies for Criminal Practices Act
Fla. State. § 772.101 *et. seq.*

*(Defendants Star One, Star One International, Hague, Villanueva and Fernandez)*

402.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

403.    Plaintiffs bring this claim against Defendants Star One, Star One International, Hague, Villanueva and Fernandez (the "RICO Defendants").

404.    Plaintiffs bring this action pursuant to 18 U.S.C. § 1964(c) and Fla. Stat. § 772.104.

405.    Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

406.    J.E.S., Jean Batarilan, Defendants J. Carruthers and R. Carruthers, and RICO Defendants Star One, Star One International, Hague, Villanueva, and Fernandez constitute an association-in-fact, and therefore an enterprise (the "RICO Enterprise") within the meaning of 18 U.S.C. § 1961(4) and Fla. Stat. § 772.102(3).

**The RICO Enterprise**

407.    The RICO Enterprise is a business relationship between J.E.S., Jean Batarilan, Defendants J. Carruthers and R. Carruthers, and RICO Defendants Star One, Star One

International, Hague, Villanueva, and Fernandez with the common purpose to profit by recruiting, obtaining, processing, and providing consistent low-cost labor of Filipino H-2B guest workers to work in the United States.

408.    The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to recruiting, obtaining, processing, and providing a consistent, low-cost Filipino workforce for Star One Defendants involved the international and interstate movement of workers which affects interstate commerce state and international borders and frequently requires travel and communication across state and international lines.

409.    Star One Defendants partnered with J.E.S., a labor recruitment and training company headed by Jean Batarilan, to serve as their agent and to recruit workers in the Philippines.

410.    Defendant R. Carruthers, and RICO Defendants Villanueva, Fernandez and Hague, who were agents, officers and employees of Star One Defendants, traveled to the Philippines to assist J.E.S. in securing workers and their visas.

411.    Once recruits were selected by Star One Defendants, upon information and belief, J.E.S. facilitated their visa and hiring process in the Philippines.

412.    When the Filipino guestworkers, including Plaintiffs, arrived in the United States, they were placed in jobs, housed, transported and paid by Star One Defendants.

413.    Villanueva, Fernandez, and Ravelo primarily supervised, directed and controlled the workers' daily activities.

414.    Upon information and belief, Hague and J. Carruthers oversaw the functioning of Villanueva, Fernandez, Ravelo and the Star One Defendants.

<u>RICO Defendants' Roles in the Enterprise</u>

415.    Defendant Star One is the company that designated J.E.S. as its agent in the Philippines, applied for visas, recruited, employed and paid Filipino guestworkers, and, upon information and belief, entered into contracts with the country clubs and hotels where the guestworkers were placed. Upon information and belief, Defendant Star One also employed Villanueva, Fernandez and Ravelo.

416.    Defendant Star One International is the company that recruited, employed and paid Filipino guestworkers, and entered into contracts with the country clubs and hotels where the guestworkers were placed. Defendant Star One International also employed Villanueva, Fernandez and Ravelo.

417.    Defendant Villanueva facilitated recruitment and placement of guestworkers and helped supervise guestworkers in the United States.

      a.   Defendant Villanueva communicated with J.E.S. to coordinate and facilitate the recruitment of guestworkers.

      b.   He directly recruited, interviewed and offered employment to the workers in the Philippines and United States.

      c.   In the United States, upon information and belief, Defendant Villanueva participated in securing contracts with country clubs and hotels where Star One Defendants employed Plaintiffs and other Filipino guestworkers.

      d.   He also helped to oversee the control, housing, transportation, training, placement and employment of the guestworkers.

      e.   Defendant Villanueva used threats, document-holding, retaliation and other means of intimidation to control the workers and compel their labor.

418.    Defendant Fernandez participated in the recruitment and training of the guestworkers in the Philippines and United States and helped supervise guestworkers in the United States.

      a.    Defendant Fernandez helped to oversee the control, housing, transportation, training, placement and employment of the guestworkers.

      b.    Defendant Fernandez used threats, retaliation and other means of intimidation to control the guestworkers and compel their labor.

419.    Defendant Hague assisted with recruitment and overseeing the operations of the Enterprise.

      a.    Defendant Hague filed visa applications and labor certifications on behalf of Star One and communicated with Consular officials to secure visas for the Filipino guestworkers.

      b.    Defendant Hague designated J.E.S. as Star One's agent in the Philippines.

      c.    Defendant Hague communicated with the POEA, a Philippine government agency, about the recruitment of guestworkers for Star One Defendants.

      d.    Upon information and belief, she traveled to the Philippines to meet with U.S. Consular officials and participate in the recruitment of the guestworkers.

      e.    Upon information and belief, in the United States, Defendant Hague oversaw the operation of Star One Defendants.

      f.    She also signed Plaintiffs' paychecks on behalf of Star One Defendants.

420.    Defendants Star One, Star One International, Villanueva, Fernandez and Hague conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(d) and Fla. Stat. § § 772,101(3) and (4), related by their common

purpose to profit by recruiting, obtaining, processing, and providing consistent, low-cost labor of Filipino H-2B guest workers to work in the United States.

421.    Specifically, Defendants Star One, Star One International, Villanueva, Fernandez and Hague conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1) and criminal activity under Fla. Stat. § 772.102(1):

    a.  Forced labor in violation of 18 U.S.C. § 1589;

    b.  Trafficking in persons for the purpose of forced labor and involuntary servitude in violation of 18 U.S.C. § 1590 and Fla. Stat. § 787.06;

    c.  Unlawful conduct with respect to documents in furtherance of trafficking in violation of 18 U.S.C. § 1592(a);

    d.  Immigration document fraud in violation of 18 U.S.C. § 1546;

    e.  Mail and wire fraud in sending fraudulent visa applications to the U.S. Department of Labor and U.S. Citizenship and Immigration Services in violation of 18 U.S.C. §§ 1341 and 1343 respectively and Fla. Stat. § 817.034; and

    f.  Interstate and foreign travel to further their unlawful scheme in violation of 18 U.S.C. § 1952.

422.    The Enterprise, as well as each RICO Defendant, received monetary benefits from defrauding, exploiting and trafficking Plaintiffs and other Filipino guestworkers. Their benefits were primarily in the form of recruitment fees, increased profits and income.

**Predicate Acts**

Forced Labor: 18 U.S.C. § 1589

423.    Defendants Star One, Star One International, Villanueva, Fernandez willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589 as discussed in Plaintiffs' First Claim for Relief.

424.    From approximately spring 2006 to November 2007, Star One Defendants, Villanueva and Fernandez used threats of serious harm and threatened abuse of the legal process to obtain the labor of Plaintiffs and other Filipino workers.

425.    Star One Defendants, through their agents Defendants Villanueva and Fernandez, caused Plaintiffs and other guestworkers to work excessive hours for unlawfully low wages by threatening them with arrest and deportation, cancellation of their visas, and refusal to renew their visas.

426.    During 2007, Star One Defendants, through their agent Defendant Villanueva, withheld updated copies of many Philippines Plaintiffs' I-94 cards.   Defendant Villanueva kept the original copies of the I-94s, and refused to provide them to the Plaintiffs they were issued to, in violation of U.S. law.

427.    These predicate acts of forced labor furthered the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

<u>Trafficking in Persons for the Purposes of Forced Labor and Involuntary Servitude:</u>
<u>18 U.S.C. § 1590 and Fla. Stat. § 787.06</u>

428.    Defendants Star One, Star One International, Villanueva, and Fernandez willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and involuntary servitude in violation of 18 U.S.C. § 1590 and Fla. Stat. § 787.06 as discussed in Plaintiffs' Second Claim for Relief.

429.   From approximately February 2006 through December 2006, Star One Defendants, through their agents Defendants Villanueva and Fernandez, and in collaboration with J.E.S., recruited, obtained, harbored, transported and provided Plaintiffs and other Filipino guestworkers for forced labor and involuntary servitude.

430.   RICO Defendants recruited and obtained Plaintiffs and other guestworkers throughout 2006.

    a.   Throughout 2006, upon information and belief, J.E.S. coordinated and hosted meetings between guestworkers and Defendants Villanueva, Fernandez, and Hague, who were acting on behalf of Star One Defendants to recruit guestworkers to work for Star One.

    b.   RICO Defendants met with U.S. Plaintiffs and other guestworkers in Florida in spring 2006, and traveled to the Philippines to meet with Philippines Plaintiffs and additional potential recruits throughout 2006.

    c.   RICO Defendants recruited and obtained Plaintiffs and other guestworkers on behalf of all other Defendants using misrepresentations regarding working conditions and wages.

431.   From approximately March 2006 to November 2007, Star One Defendants, through their agents Ravelo and Defendants Villanueva and Fernandez, harbored and transported Plaintiffs and other Filipino guestworkers for the purposes of forced labor and involuntary servitude.

    a.   Upon information and belief, these Defendants obtained two houses in Miami, Florida, one house in Boca Raton, Florida, two houses in Glen Head, New York, and two houses in Roslyn Heights, New York (collectively "Star One Housing") in which to house Plaintiffs and other Filipino guestworkers.

      b.   Ravelo and Defendants Villanueva and Fernandez resided in these houses with Plaintiffs and other guestworkers.

432.   From approximately March 2006 to November 2007, Star One Defendants, through their agent Defendant Villanueva and other agents of Star One, also transported Plaintiffs and other Filipino guestworkers from the Star One Housing to their job sites at country clubs and hotels and from one job site to another.

      a.   In approximately May 2006, Star One Defendants, through their agent Defendant Villanueva and other agents of Star One, transported U.S. Plaintiffs and other Filipino workers from Florida to New York to work in country clubs and banquet halls.

      b.   Between approximately April and May 2007, these Defendants transported most of the Philippines Plaintiffs and other Filipino guestworkers from Florida to New York for the same purpose.

      c.   RICO Defendants also transported some Plaintiffs to job sites without their consent and threatened serious harm and/or abuse of the legal process if they complained or attempted to refuse to work.

      d.   When Plaintiffs were transported to New York, they were similarly threatened.

433.   Between approximately March 2006 and November 2007, RICO Defendants provided Plaintiffs and other Filipino guestworkers to country clubs, hotels, and banquet halls in Florida and New York.

434.   RICO Defendants subsequently subjected Plaintiffs and other guestworkers to forced labor and involuntary servitude as stated in Paragraphs 402-406.

435.    These predicate acts of trafficking for forced labor and involuntary servitude furthered the goal of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

Unlawful Conduct with Respect to Documents in Furtherance of Trafficking:<br>18 U.S.C. § 1592(a)

436.    Defendants Star One, Star One International, Villanueva, and Fernandez willfully, knowingly, and intentionally committed and/or conspired to commit predicate acts of unlawful conduct with respect to documents in violation of 18 U.S.C. § 1592(a) as discussed in Plaintiffs' Second Claim for Relief.

437.    Throughout 2007, RICO Defendants, through their agent Villanueva, withheld the updated copies of many of the Philippines Plaintiffs' I-94 cards, mailed to Star One by U.S. Citizenship and Immigration Services to document the renewal of their visas.

438.    These predicate acts of unlawful conduct with respect to documents furthered the goal of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

Immigration Document Fraud: 18 U.S.C. § 1546

439.    Defendants Star One, Star One International, Hague, and Villanueva in the RICO Enterprise fraudulently obtained H-2B visas by knowingly making false claims and statements about the nature and location of the work and the wage to be paid in violation of 18 U.S.C. § 1546.  The false claims and statements were made willfully, knowingly, and intentionally.

440.    Defendant Star One submitted an Application for Alien Employment Certification, a form that must be submitted to the U.S. Department of Labor in order to secure H-2B guestworkers, signed by Defendant Hague on February 28, 2006, that contained material misrepresentations.

441.    By signing the form, Defendant Hague certified that the 31 guestworkers sought would be employed as waiters and waitresses at Boca Woods Country Club.

442.    Defendant Hague also certified that each employee would work one shift per day, five days per week.

443.    On Star One Defendants' September 7, 2006 Petition for Nonimmigrant Workers, signed by Defendant Hague and submitted to U.S. Citizenship and Immigration Services, Defendant Star One similarly certified that Plaintiffs Auingan, Bautista, De Quiros, Real, Magnifico, B. Ramos and Ordonez would work at Boca Woods Country Club as waiters and work full-time, earning $271.12 per week.

444.    In a letter accompanying this petition, Defendant Hague also stated that Star One had been unable to fill the available positions with U.S. workers despite actively seeking workers in the U.S.

445.    However, once they arrived in Florida, Defendants failed to place any of the Plaintiffs at Boca Woods Country Club or to pay Plaintiffs their promised wages.

446.    Defendants also compelled Plaintiffs to work in positions other than as waiters, to work multiple shifts, and to work more than five days per week, all in direct violation of the certifications, described in the preceding paragraphs, made by Star One to the federal government.

447.    Upon information and belief, Star One Defendants submitted other Applications for Alien Employment Certification and Petitions for Nonimmigrant Workers on behalf of Plaintiffs and other guestworkers containing misrepresentations during approximately the same time period.

448.    These predicate acts of immigration document fraud furthered the goal of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

<u>Mail Fraud: 18 U.S.C. § 1341 and Fla. Stat. § 817.034</u>

449.    As set forth in the preceding paragraphs, Defendants Star One, Star One International, Hague, and Villanueva fraudulently obtained H-2B visas.  Defendants also made, and/or conspired to make, false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into remaining in the employ of Star One Defendants.

450.    Defendants used the mails on numerous occasions during 2006 to further these fraudulent schemes.

451.    Upon information and belief, the fraudulent applications for labor certification and H-2B visas described in Paragraphs 439-448 were submitted to the Department of Labor and U.S. Citizenship and Immigration Services by the U.S. Postal Service or commercial carrier.

452.    Defendant Hague sent a letter dated August 27, 2006 to the POEA and J.E.S. that included fraudulent information regarding conditions of Star One Defendants' employment, as detailed in Paragraph 70, by the U.S. postal service or commercial carrier.

453.    These willful, knowing, and intentional acts constitute mail fraud in violation of 18 U.S.C. § 1341 and Fla. Stat. § 817.034.

454.    These predicate acts of mail fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

<u>Wire Fraud: 18 U.S.C. § 1343 and Fla. Stat. § 817.034</u>

455.    As set forth in the preceding paragraphs, Defendants Star One, Star One International, Hague, and Villanueva fraudulently obtained H-2B visas.   Defendants also made, and/or conspired to make, false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into remaining in the employ of Star One Defendants.

456.    Defendants used wire communications via telephone, fax, and/or email on numerous occasions to further these schemes.

457.    Upon information and belief, during 2006, Defendant Villanueva sent emails to J.E.S. describing the job openings for guestworkers at Star One.

458.    Upon information and belief, Defendant Villanueva also sent emails to potential recruits describing the available jobs at Star One during 2006.

459.    In October 2006, Defendant Hague sent an email to the Nonimmigrant Visa Chief at the U.S. Embassy in the Philippines, explaining that she was in the Philippines with R. Carruthers and wanted to meet with the Nonimmigrant Visa Chief to request his assistance in scheduling a group interview for 30 applicants whose H-2B petition had been granted.

460.    These willful, knowing, and intentional acts constitute wire fraud in violation of 18 U.S.C. § 1343 and Fla. Stat. § 817.034.

461.    These predicate acts of wire fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

<u>Unlawful Acts in Support of Racketeering Enterprises through Interstate and Foreign Travel:
18 U.S.C. § 1952</u>

462.    As set forth in the preceding paragraphs, Defendants Star One, Star One International, Hague, Villanueva and Fernandez regularly engaged in, and/or conspired to engage in, interstate and foreign travel to carry on their unlawful activities.

463.    With the assistance and coordination of J.E.S., Defendants Villanueva and Fernandez traveled repeatedly to the Philippines between approximately June 2006 and October 2006 to recruit and train Filipino workers.

464.    Defendant Villanueva conducted in-person interviews with each Philippines Plaintiff and other applicants in the Philippines and discussed their conditions and terms of employment.

465.    Defendants Villanueva and Fernandez also conducted trainings in the Philippines for those Plaintiffs and other recruits who they determined did not have experience in the food service industry.

466.    In approximately October 2006, Defendant Hague traveled to the Philippines, along with Ruth Carruthers, to meet with Philippines Plaintiffs and other newly hired Filipino guestworkers on behalf of Star One Defendants, and to meet with U.S. consular officials in the Philippines to arrange a group interview of Philippines Plaintiffs and other guestworkers for processing of their visa petitions.

467.    Star One Defendants, through their agents Defendants Villanueva and Fernandez, transported Plaintiffs from Florida to New York.

    a.    In approximately May 2006, Star One Defendants, through their agents Defendants Villanueva and Fernandez, transported Plaintiffs Caluya, Ripotola, C. Ramos, and Rueda (collectively "U.S. Plaintiffs") and other Star One Defendants' employees from Florida to New York, where they would be placed in country clubs and hotels in Nassau County.

    b.   Defendant Villanueva oversaw this transfer of workers.

    c.   During approximately April and May 2007 Defendants transported most of the Philippines Plaintiffs and other guestworkers from Florida to New York. Defendant Villanueva oversaw this transfer.

    d.   Throughout approximately 2006 and 2007, Ravelo, Defendants Villanueva and Fernandez all traveled between Florida and New York to assist in the supervision of Plaintiffs and other workers on behalf of Star One Defendants.

468.   These willful, knowing, and intentional acts violated 18 U.S.C. § 1952.

### Pattern of Related Racketeering Acts

469.   The predicate acts of racketeering activity described above constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5) and a "pattern of criminal activity" as defined in Fla. Stat. § 772.102(4).

470.   The predicate acts were related to the enterprise.  In carrying out the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor for work in the United States, Defendants in the RICO Enterprise utilized fraudulent recruitment methods and tactics designed to compel involuntary labor.

471.   Defendants in the RICO Enterprise repeatedly and systematically utilized mail fraud, wire fraud, immigration document fraud, and interstate and foreign travel to recruit Plaintiffs and other Filipino nationals and secure visas for them to work in the United States.

472.   Once Plaintiffs were in the United States, Defendants engaged in additional unlawful conduct, including forced labor, trafficking in persons, and unlawful conduct with respect to documents in furtherance of trafficking.

473.    Defendants engaged in the racketeering activity described in this Complaint repeatedly, beginning as early as March 2006 through at least November 2007 with respect to approximately 70 Filipino workers.

474.    Defendants engaged in these acts to obtain Plaintiffs' labor and compel Plaintiffs to continue working in exploitative working conditions for unlawfully low wages.

475.    Defendants in the RICO Enterprise relied on the racketeering acts described in this Complaint to conduct their regular business activities.    The above-named Defendants' racketeering acts have similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other similarly situated individuals, and to recruit, obtain, provide, and maintain a consistent Filipino H-2B guestworker labor force in the United States for Star One Defendants.

476.    Defendants' acts have yielded similar results and caused similar injuries to Plaintiffs, including payment of high fees, assumption of interest-bearing debt, lost work opportunities, and lost or unpaid wages.

477.    As set forth in the preceding paragraphs, the racketeering acts have similar participants: Defendants Star One, Star One International, Villanueva, Fernandez and Hague.

478.    As set forth in the preceding paragraphs, Defendants directed their racketeering activities at similar victims: Filipino workers seeking overseas employment.

479.    Defendants' acts have similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs, use of similar employment practices and policies with respect to Plaintiffs, and similar methods of coercion and control of Plaintiffs and other similarly situated individuals.

**Conspiracy**

480.    Starting around 2006, RICO Defendants devised, implemented and coordinated a scheme to profit from recruiting, providing and obtaining low-cost Filipino labor through the H-2B guestworker program.

481.    RICO Defendants conspired to obtain guestworkers to place in various country clubs and hotels in Florida and New York by filing fraudulent applications for H-2B visas.

482.    Defendants also conspired to defraud the U.S. government, and to defraud and exploit Filipino guestworkers by using misrepresentations regarding working conditions and pay to recruit workers, and by unlawfully underpaying and overworking the guestworkers.

483.    RICO Defendants knowingly agreed to the overall objective of the conspiracy to increase profits by recruiting and exploiting low-cost Filipino laborers, and agreed to commit various predicate acts in furtherance of that scheme.

484.    In order to successfully perpetrate their scheme, Star One Defendants utilized Defendants Villanueva and Fernandez, and formed a partnership with J.E.S. to recruit and process Filipino guestworkers.  Star One Defendants also hired Ravelo to work with Villanueva and Fernandez to supervise, direct, and control the guestworkers once in the United States.

485.    As evidence of the conspiracy, Defendant Hague, on behalf of Star One Defendants, filed various fraudulent petitions for labor certification with the Department of Labor, and for H-2B visas with U.S. Citizenship and Immigration Services in 2006.

486.    As explained in Paragraphs 418-427439-448, the petitions filed by Defendant Hague included false information, including a statement of Star One's inability to recruit U.S. workers; the location of the employment site for the 30 guestworkers; a work schedule of one shift per day, five days per week; and wages of $271.12 per week

487.   In order to further effectuate the conspiracy, Defendants acquired houses to place Plaintiffs and other guestworkers and selected agents to supervise, direct, and control the guestworkers in each house, including Defendants Villanueva and Fernandez.

488.   Star One Defendants, through their agent Defendant Villanueva, withheld the I-94 cards of Plaintiffs and other guestworkers whose visas were renewed.

489.   As evidence of the conspiracy, Defendant Hague, on behalf of Star One, acknowledged in a January 10, 2008 letter to Star One's immigration attorney, that Defendants had been in possession of several of Plaintiffs' I-94 cards prior to their escapes from Star One.

490.   The conspiracy also required that RICO Defendants underpay and overwork the guestworkers in order to profit from their labor.

491.   As evidence of the conspiracy, Defendant Hague, on behalf of Star One Defendants, signed paychecks throughout 2006 and 2007 for Plaintiffs and other guestworkers that did not include full payment for the hours Plaintiffs and other guestworkers worked.

492.   The payment summaries produced by Star One Defendants and distributed to Plaintiffs and other guestworkers by Ravelo and Defendant Villanueva show that Defendants also made unlawful deductions from the wages of Plaintiffs and other guestworkers and failed to pay the minimum wage and overtime payments required by Florida, New York, and federal law.

493.   As a result of the conspiracy, Defendants have obtained profits through the exploitations of Plaintiffs and other guestworkers.

### Injury

494.   As a direct and proximate result of Defendant Star One, Star One International, Hague, Villanueva and Fernandez's willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries including, but not limited to, payment of exorbitant recruitment

fees for job application, visas, and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; lost and unpaid wages, lost employment opportunities; and other pecuniary and/or losses to real or personal property.

495.   Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and/or threefold the amount gained from human trafficking, and attorneys' fees and costs associated with this action and any other relief deemed appropriate.

<u>SEVENTH CLAIM FOR RELIEF</u>

Fair Labor Standards Act ("FLSA")
29 U.S.C. § § 201 *et seq.*

*(All Defendants)*

496.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

497.   Plaintiffs bring this claim against all Defendants.

498.   This claim is brought under 29 U.S.C. § 216(b).

499.   Defendants violated 29 U.S.C. § 206(b) by failing to pay Plaintiffs the applicable federal minimum wage for all hours worked.

500.   Defendants violated 29 U.S.C. § 207 by failing to pay Plaintiffs overtime for all hours worked in excess of forty each week.

501.   Defendants failed to reimburse Philippines Plaintiffs within their first week of employment for visa fees and other recruitment-associated expenses, which were primarily for the benefit of Defendant employers. Because Defendants failed to do so, Philippines Plaintiffs were not paid all wages free and clear during their first week of work, in violation of 29 U.S.C. § 206(a)(1).

502.   Plaintiffs' housing and transportation were primarily for the benefit of Defendant employers.

503.   Defendants' unlawful deductions from Plaintiffs' wages for housing, food, and transportation cumulatively brought Plaintiffs' wages below the statutory minimum.

504.   Defendants failed to pay Plaintiffs for each hour of work that they performed.

505.   Defendants failed to provide Plaintiffs with tips designated for them or to include those tips when calculating their regular rate of pay for the purposes of determining the proper overtime rate.

506.   Defendants' failure to pay Plaintiffs their federally-mandated minimum and overtime wages were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

507.   Defendants either knowingly violated the FLSA or disregarded the very possibility that they were violating the FLSA. Defendants were aware of the FLSA's requirements but failed to take the necessary affirmative actions to comply with these requirements.

508.   As a result of the above violations, Plaintiffs suffered damages.

509.   Plaintiffs are entitled to an award of their unpaid minimum and overtime wages, plus an equal amount in liquidated damages, reasonable attorneys' fees and costs.

EIGHTH CLAIM FOR RELIEF

Florida Minimum Wage Act
Section 24, Article X of the Florida Constitution & Fla. Stat. § 448.110

*(All Defendants)*
*(As to Philippines Plaintiffs only)*

510.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

511.    Philippines Plaintiffs bring this claim against Defendants.

512.    This claim is brought under Fla. Stat. § 448.110(6)(a).

513.    At all times relevant to this action, Philippines Plaintiffs were "employees" of Defendants within the meaning of Fla. Stat. § 448.109(1)(a).

514.    At all times relevant to this action, Defendants were "employers" of Philippines Plaintiffs within the meaning of Fla. Stat. § 448.109(1)(a).

515.    At all times relevant to this action, Philippines Plaintiffs were employed by Defendants.

516.    Defendants violated Fla. Stat. § 448.110 by failing to pay Philippines Plaintiffs the applicable Florida minimum wage for all hours worked in Florida.

517.    Defendants failed to prominently display the required notice advising employees of their right to be paid the FL minimum wage in violation of Fla. Stat. § § 448.109(2) & (3).

518.    Defendants' failure to pay Plaintiffs their FL wages were willful violations of the FMWA within the meaning of 29 U.S.C. § 255(a).

519.    Defendants either knowingly violated the FMWA or disregarded the very possibility that they were violating the FMWA. Defendants were aware of the FMWA's requirements but failed to take the necessary affirmative actions to comply with these requirements.

520.    As a result of the above violations, Philippines Plaintiffs suffered damages.

521.    Philippines Plaintiffs sent Defendants a written notice of their claim in accordance with Fla. Stat. § 448.10(6).

522.    Defendants failed to pay the total amount of unpaid wages or otherwise satisfy the claim to Plaintiffs' satisfaction within 15 days of receipt of the written notice.

523.    Philippines Plaintiffs are entitled to an award of their unpaid minimum wages, plus an equal amount in liquidated damages, reasonable attorney's fees and costs.

<u>NINTH CLAIM FOR RELIEF</u>

New York Labor Law – Minimum Wages
N.Y. Lab. L. § § 190 *et seq.* and § § 650 *et seq.*
12 NY COMP. CODES R. & REGS. TIT. § 137-1.2

*(All Defendants)*
*(As to Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos only)*

524.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 346 as if set forth fully herein.

525.    Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos bring this claim against all Defendants.

526.    This claim is brought under NY Lab. L. § 663(1) and 12 NY COMP. CODES R. & REGS. TIT. § 137-1.2.

527.    At all times relevant to this action, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos were "employees" of Defendants within the meaning of NY Lab. L. § 651(5) and 12 NY COMP. CODES R. & REGS. TIT. § 137-3.2(a).

528.    At all times relevant to this action, Defendants were "employers" of Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos within the meaning of NY Lab. L. § 651(6) and "employers in the restaurant industry" within the meaning of 12 NY COMP. CODES R. & REGS. TIT. § 137-1.1.

529.    Defendants willfully violated NY Lab. L. § 652 by failing to pay Plaintiffs Rueda, Caluya and De Quiros the applicable New York minimum wage for all hours worked in the restaurant industry while in New York.

530.    Defendants made unlawful deductions from Plaintiffs Rueda, Caluya, De Quiros and C. Ramos' wages for housing, food, and transportation in violation of NY Lab. L. § 193 and 12 NY COMP. CODES R. & REGS. TIT. § 137-2.5.

531.    Defendants' unlawful deductions from Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos' wages cumulatively brought Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos' wages below the statutory minimum.

532.    As a result of the above violations, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos suffered damages.

533.    Plaintiffs Rueda, Caluya, De Quiros and Cesar R. are entitled to an award of their unpaid minimum wages, plus an equal amount to one-quarter of their unpaid minimum wages in the form of liquidated damages, reasonable attorney's fees and costs and prejudgment interest.

<u>TENTH CLAIM FOR RELIEF</u>

New York Labor Law – Overtime
N.Y. Lab. L. § § 650 *et seq.*
12 NY COMP. CODES R. & REGS. TIT. § 137-1.3

*(All Defendants)*
*(As to Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos only)*

534.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

535.    Plaintiffs Rueda, Caluya, De Quiros and C. Ramos bring this claim against all Defendants.

536.    This claim is brought under NY LAB. L. § 663(1) and 12 NY COMP. CODES R. & REGS. TIT. § 137-1.3.

537.    At all times relevant to this action, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos were "employees" of Defendants within the meaning of NY LAB. L. § 651(5) and 12 NY COMP. CODES R. & REGS. TIT. § 137-3.2(a).

538.    At all times relevant to this action, Defendants were "employers" of Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos within the meaning of NY LAB. L. § 651(6) and "employers in the restaurant industry" within the meaning of 12 NY COMP. CODES R. & REGS. TIT. § 137-1.1.

539.    At all times relevant to this action, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos were employed by Defendants within the meaning of NY LAB. L. § 651.

540.    Defendants willfully violated 12 NY COMP. CODES R. & REGS. TIT. § 137-1.3 by failing to pay Plaintiffs Rueda, Caluya, De Quiros and C. Ramos overtime wages for all hours worked in excess of forty-four per week which they were entitled to receive under NY LAB. L. § 652 for work performed  in New York.

541.    As a result of the above violations, Plaintiffs Rueda, Caluya,  De Quiros, and C. Ramos suffered damages.

542.    Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos are entitled to an award of their unpaid overtime wages, plus an equal amount to one-quarter of their unpaid minimum wages in the form of liquidated damages, reasonable attorney's fees and costs and prejudgment interest.

<u>ELEVENTH CLAIM FOR RELIEF</u>

New York Labor Law – Spread of Hours
N.Y. Lab. L. § § 650 *et seq.*
12 NY COMP. CODES R. & REGS. TIT. § 137-1.7

*(All Defendants)*

*(As to Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos)*

543.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

544.    Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos bring this claim against all Defendants.

545.    Under New York law, an employee is entitled to an extra hour of wages for any day when the employee's "spread of hours" exceeds 10 hours. 12 NY COMP. CODES R. & REGS. TIT. § 137-1.7.

546.    This claim is brought under NY Lab. L. § 663(1) and 12 NY COMP. CODES R. & REGS. TIT. § 137-1.7.

547.    At all times relevant to this action, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos were "employees" of Defendants within the meaning of NY Lab. L. § 651(5) and 12 NY COMP. CODES R. & REGS. TIT. § 137-3.2(a).

548.    At all times relevant to this action, Defendants were "employers" of Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos within the meaning of NY Lab. L. § 651(6) and "employers in the restaurant industry" within the meaning of 12 NY COMP. CODES R. & REGS. TIT. § 137-1.1.

549.    Defendants regularly required Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos to work in excess of 10 hours a day during their employment. Defendants had full knowledge that they were requiring Plaintiffs to work above and beyond 10 hours per day.

550.    Defendants did not provided the required additional compensation for any days during which Plaintiffs' spread of hours exceeded 10 hours.

551.    As a result of the above violations, Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos suffered damages.

552.     Plaintiffs Rueda, Caluya, De Quiros, and C. Ramos are entitled to an award of all spread of hours payments in the form of one hour of additional pay at the minimum wage rate for each day in which they had a spread of hours in excess of 10 hours, liquidated damages, reasonable attorneys' fees and costs and prejudgment interest.

TWELFTH CLAIM FOR RELIEF

Breach of Contract

*(Defendants Star One, Star One International, Hague,
J. Carruthers, R. Carruthers, Villanueva)*

Philippines Plaintiffs

553.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

554.     Philippines Plaintiffs bring this claim against Defendants Star One, Star One International, Hague, J. Carruthers, R. Carruthers, and Villanueva.

555.     Defendants, through their agents, employees, and/or representatives, offered, and Philippines Plaintiffs accepted, to obtain and maintain their immigration status, to provide employment as waiters and waitresses in the United States for six months at a wage rate of six dollars seventy-eight cents ($6.78) per hour, to provide overtime pay at 1.5 times the regular wage rate for work over eight hours per day or over six days per week, to provide free housing, food and transportation in the United States, to provide them with allowances, to provide free transportation to Florida, and to provide free return transportation to the Philippines.

556.     Philippines Plaintiffs advanced consideration for the promises set out in the employment contract in that Philippines Plaintiffs paid fees to Defendants and their agents and/or representatives and left work and their families in the Philippines and traveled to the United States.

557.    Philippines Plaintiffs paid large sums of money, many entered into interest-bearing debts, surrendered other employment opportunities, incurred other financial losses, and performed work for Defendants.

558.    Plaintiffs performed all of the conditions, covenants and promises in accordance with the terms and conditions of the agreements.

559.    Defendants failed to comply with their obligations under the contractually-binding agreements entered into with Philippines Plaintiffs.

560.    As a direct result of Defendants' breach, Philippines Plaintiffs suffered and continue to suffer damages.

561.    Philippines Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

<u>U.S. Plaintiffs</u>

562.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

563.    U.S. Plaintiffs bring this claim against Defendants Star One, Star One International, Hague, J. Carruthers, R. Carruthers, and Villanueva.

564.    Defendants, through their agents, employees, and/or representatives, offered, and U.S. Plaintiffs accepted, to obtain and maintain H-2B visas for them, file residency petitions to secure them lawful permanent residency, to provide employment at $7.00 per hour for work as waiters, to provide overtime pay at 1.5 times the regular wage rate for work over eight hours per day or over six days per week, provide free food and housing, free transportation to and from the housing to the work site, and to provide free return transportation to the Philippines.

565.    Plaintiff Ramos was promised an hourly wage of somewhere between $10.00 and $12.00 per hour.

566.    As part of their contractual obligations, Defendants, through their agents, employees, and/or representatives, further offered and Plaintiff Ripotola accepted, to provide him with a return ticket to the Philippines prior to the termination of his visa, and petition to bring him back to the United States.

567.    U.S. Plaintiffs advanced consideration for the promises set out in the employment contract in that Plaintiffs left work and their existing visas to work for Defendants.

568.    In reasonable and justifiable reliance on these agreements, U.S. Plaintiffs surrendered other employment and immigration opportunities and performed work for Defendants.

569.    Defendants failed to comply with their obligations under the contractually-binding agreements entered into with U.S. Plaintiffs.

570.    As a direct result of Defendants Star One, Star One International, Hague, J. Carruthers, R. Carruthers, and Villanueva's breach, U.S. Plaintiffs suffered and continue to suffer damages.

571.    U.S. Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF

Fraud and Negligent Misrepresentation

*(All Defendants)*

572.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

573.    Plaintiffs bring this claim against all Defendants.

84

574.     Prior to and at the time of executing an employment contract and throughout the period of employment, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and deceptive statements and representations about existing facts, and knowingly and/or negligently made materially false and deceptive statements and representations about future actions with no intent to fulfill those promises to Plaintiffs, regarding the nature and terms and conditions of employment and the obtaining and maintenance of immigration status and employment authorization in the United States.

575.     Defendants knowingly and/or negligently failed to disclose material facts to Plaintiffs regarding the nature, terms and conditions of employment and the obtaining and maintenance of immigration status and employment authorization in the United States.

576.     Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Philippines Plaintiffs to pay large recruitment fees, leave their homes and jobs in the Philippines and travel to the United States to work for Defendants, and to remain in Defendants' employ.

577.     Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce U.S. Plaintiffs to leave their homes, existing jobs and forego their existing work authorization in the United States to work for Defendants, and to remain in Defendants' employ.

578.     Plaintiffs reasonably relied on the representations of Defendants and their agents, employees and/or representatives and had no reason to believe that their representations were false.

579.   Plaintiffs were entitled to rely on the representations of Defendants and their agents, employees and/or representatives.

580.   As a direct and proximate result of the representations of Defendants and their agents, employees and/or representatives, Plaintiffs have been injured.

581.   Philippines Plaintiffs believed these representations, and in reasonable and justifiable reliance on the representations of Defendants and their agents, employees and/or representatives, Philippines Plaintiffs paid large sums of money, entered into interest-bearing debts, surrendered other employment opportunities, incurred other financial losses, continued working for Defendants to their detriment without receiving fair compensation for their labor, suffered emotional injury, incurred legal liabilities and harm to their present and future immigration and employment status, and suffered other injuries.

582.   U.S. Plaintiffs believed these representations, and in reasonable and justifiable reliance on the representations of Defendants and their agents, employees and/or representatives U.S. Plaintiffs surrendered other employment and immigration opportunities, incurred financial losses, continued working for Defendants to their detriment without receiving fair compensation for their labor, suffered emotional injury, incurred legal liabilities and harm to their present and future immigration and employment status, and suffered other injuries.

583.   Defendants showed willful, conscious, wanton, and reckless disregard for Plaintiffs' rights and for the deleterious consequences and unjust hardship placed upon Plaintiffs as a result of the representations of Defendants and their agents, employees and/or representatives.

584.   Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

<u>FOURTEENTH CLAIM FOR RELIEF</u>

Unjust Enrichment

*(All Defendants)*

585.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

586.    Plaintiffs bring this claim against all Defendants.

587.    By performing labor for Star One, as alleged *supra*, Plaintiffs conferred benefits on Defendants.

588.    Defendants had knowledge of the benefits conferred on them by Plaintiffs' labor, and Defendants accepted and retained those benefits.

589.    Plaintiffs engaged in labor for Defendants with the expectation of being compensated at the contractual wage and overtime rates for that labor.

590.    It would be inequitable for the Defendants to be permitted to retain such benefits without paying Plaintiff the value of the benefits conferred.

591.    Accordingly, Plaintiffs are entitled to damages in an amount to be proven at trial.

FIFTEENTH CLAIM FOR RELIEF

Intentional Infliction of Emotional Distress

*(Defendants Villanueva and Fernandez)*

592.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

593.    Plaintiffs bring this claim against Defendants Villanueva and Fernandez.

594.    Defendants engaged in extreme and outrageous conduct with intent to cause Plaintiffs severe emotional distress and/or with a reckless disregard for the high probability that severe emotional distress would occur.

595.    Defendants' conduct which intentionally inflicted emotional distress included, but is not limited to, verbal abuse, the use of threats and coercion to force Plaintiffs to continue working for Defendants, including threats of arrest and deportation, the manipulation of the legal process to force continued labor, the withholding of immigration documents, and the failure to provide adequate food and housing.

596.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer severe emotional distress.

597.    Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

SIXTEENTH CLAIM FOR RELIEF

Negligent Infliction of Emotional Distress

*(All Defendants)*

598.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 346 as if set forth fully herein.

599.     Plaintiffs bring this claim against all Defendants.

600.     Defendants negligently engaged in extreme and outrageous conduct towards Plaintiffs and caused Plaintiffs to suffer severe emotional distress.

601.     Defendants owed a duty to Plaintiffs as Plaintiffs' recruiters, employers and landlords to provide safe housing and work conditions, and it was foreseeable that verbal abuse; the use of threats and coercion to force Plaintiffs to continue working for Defendants, including threats of arrest and deportation; the manipulation of the legal process to force continued labor; the withholding of immigration documents; causing harm to Plaintiffs' immigration status; the refusal to pay contractually defined wages; and the failure to provide adequate food and housing would cause Plaintiffs to suffer severe emotional distress.

602.     Defendants breached their duty to Plaintiffs by negligently engaging in the conduct described herein.

603.     As a proximate result of this conduct, Plaintiffs suffered severe emotional distress, including emotional reactions such as fear, humiliation, anxiety, depression, helplessness, and anger.

604.     Plaintiffs are entitled to recover damages in an amount to be proven at trial.

SEVENTEENTH CLAIM FOR RELIEF

Negligent Supervision and Retention

*(Defendants Star One, Star One International, Hague, J. Carruthers, and R. Carruthers)*

605.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 366 as if set forth fully herein.

606.     Plaintiffs bring this claim against Defendants Star One, Star One International, Hague, J. Carruthers, and R. Carruthers.

607.    Defendants were negligent in supervising and retaining their employees, Defendants Villanueva and Fernandez.

608.    The above-named Defendants owed a duty to Plaintiffs to monitor Defendants Villanueva and Fernandez to ensure they properly performed their duties, to be aware of their unfitness for their positions with Star One Defendants, and to take corrective action in light of said unfitness.

609.    Plaintiffs were within the foreseeable zone of risk created by the negligent supervision and retention of Villanueva because Villanueva's job was to recruit, supervise, house, feed and transport Defendants' employees, including Plaintiffs.

610.    Plaintiffs were within the foreseeable zone of risk created by the negligent supervision and retention of Fernandez because, upon information and belief, Fernandez's job was to assist in recruiting, supervision, housing, feeding, and transporting Defendants' employees, including Plaintiffs.

611.    Defendants breached these duties by failing to adequately monitor Villanueva and Fernandez's performance, failing to investigate Plaintiffs' and other employee's complaints regarding Villanueva and Fernandez, and by failing to take corrective action in light of knowledge Defendants had, or should have had, regarding Villanueva and Fernandez's unfitness for the job.

612.    In their positions with Star One Defendants, Villanueva and Fernandez caused injury to Plaintiffs, including but not limited to: inducing Philippines Plaintiffs to incur recruitment and travel-related expenses and travel to the United States to work for Star One through fraudulent or negligent misrepresentations of the terms and conditions of employment; inducing U.S. Plaintiffs to forego their lawful employment and immigration status in the U.S. to work for Star One through fraudulent or negligent misrepresentations of the terms and conditions of employment,

including the ability to provide continued work authorization; causing harm to Plaintiffs' immigration status; unlawfully retaining some Plaintiffs' immigration documents; forcing or coercing Plaintiffs into working against their will; failing to pay Plaintiffs properly; housing and transporting Plaintiffs in unsafe and overcrowded conditions; and causing them severe emotional distress by threatening Plaintiffs with arrest, detention, deportation, loss of their immigration status, and litigation; subjecting them to verbal abuse; and forcing or coercing Plaintiffs into working long hours with insufficient rest.

613.    Plaintiffs' injuries occurred, in part, on premises secured by Defendants for the purpose of housing Defendants' employees, including Plaintiffs.

614.    Defendants were aware, or should have been aware, of Villanueva and Fernandez's harmful and unlawful conduct.

615.    Defendants were made aware of Villanueva and Fernandez's harmful conduct by multiple complaints from Defendants' employees, including Plaintiffs Real and Relampagos, made directly to Defendants Hague and J. Carruthers.

616.    A reasonably prudent person would have investigated or taken corrective action against Villanueva and Fernandez in light of employee complaints regarding conduct described herein because these complaints were directly related to Villanueva and Fernandez's fitness for their positions with Star One Defendants.

617.    Defendants' breach of their duties to monitor Villanueva and Fernandez and to take corrective action when notified of their unfitness for their positions was a proximate cause of Plaintiffs' injuries.

618.    Plaintiffs are entitled to recover damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.  Declaratory and injunctive relief;

b.  Compensatory damages;

c.  Punitive damages;

d.  Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

e.  Treble damages or threefold the amount gained from human trafficking as authorized by Fla. Stat. § 772.104(1) and (2).

f.  Liquidated damages as authorized by the FLSA, 29 U.S.C. § 216, the FMWA, Fla. Stat. § 448.110(c), and NY Lab. L. § 663(1);

g.  Attorneys fees and costs;

h.  Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on each and every claim set forth herein.

Respectfully submitted, this 28th day of February, 2011.

 /s/ Gregory Schell
Gregory S. Schell
Florida Bar Number 287199
Migrant Farmworker Justice Project
FLORIDA LEGAL SERVICES, INC.
508 Lucerne Avenue
Lake Worth, FL 33460-3819
Telephone:    (561) 582-3921
Facsimile:    (561) 582-4884
Email:        Greg@Floridalegal.org

/s/ Annie Smith
Annie Smith
Visiting Associate Clinical Professor of Law
George Washington University Law School
International Human Rights Clinic
2000 G Street, NW
Washington, DC 20052
Telephone: (202) 994-7659
Facsimile: (202) 994-4693


/s/ Theresa Harris
Theresa Harris, Executive Director

/s/ Allison Lefrak
Theresa Harris, Litigation Director

/s/ Lynsay Gott
Lynsay Gott, Program Director

World Organization for Human Rights USA
2029 P Street NW, Suite 202
Washington, DC 20036
Telephone: (202) 296-5702
Facsimile: (202) 296-5704

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on Marlene Quintana Esq. via transmission of Notices of Electronic Filing generated by CM/ECF and on Defendant Roberto Villanueva by first class mail, postage prepaid, to 4699 N.W. 7th Avenue, Miami, Florida   33127.


By: __/s/_ Gregory S. Schell_____
Gregory S. Schell, Esq.